## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,               )
Money Laundering and Asset Recovery Section   )
Criminal Division                       )
United States Department of Justice     )
1400 New York Avenue, NW 10th Floor     )
Washington, DC 20005                    )
                                        )
          Plaintiff,                    )
                                        )
               v.                       )          Case No. _____
                                        )
$215,587.22 IN U.S. CURRENCY SEIZED     )
FROM BANK ACCOUNT NUMBER                )
100606401387436 HELD IN THE NAME OF JJ  )
SZLAVIK COMPANIES, INC. AT CITIZENS     )
BANK;                                   )
                                        )
$10,174.52 SEIZED FROM BANK ACCOUNT     )
NUMBER 2045233794 HELD IN THE NAME      )
OF JOSEPH SZLAVIK AT WELLS FARGO        )
BANK;                                   )
                                        )
$27,835.09 SEIZED FROM ACCOUNT          )
NUMBER 873653221 AND $72,000 FROM       )
ACCOUNT NUMBER 784051843, BOTH          )
HELD IN THE NAME OF JOSEPH SZLAVIK      )
AT INVESTMENT AT TD AMERITRADE;         )
                                        )
$100.00, $106,224.83, AND $4,600.00, SEIZED  )
FROM ACCOUNT NUMBERS 1100769,           )
3100650, AND 4100662, RESPECTIVELY,     )
HELD IN THE NAME OF JOSEPH SZLAVIK      )
AND/OR SCRIBE STRATEGIES AND            )
ASSOCIATES AT WASHINGTON FIRST          )
BANK;                                   )
                                        )
$25,000.00 SEIZED FROM ACCOUNT          )
NUMBER 22J-35212-11 HELD IN THE NAME    )
OF JOSEPH SZLAVIK AT MORGAN             )
STANLEY SMITH BARNEY; AND               )
                                        )
$13,883.55 SEIZED FROM ACCOUNT          )
NUMBER 1367473 HELD IN THE NAME OF      )

MERCURY MANAGEMENT, INC. AT FIRST )
NIAGARA BANK,                     )
                                  )
        Defendants.               )
_____   )

## VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

Plaintiff, the United States of America, through its undersigned attorneys, for its Verified

Complaint for Forfeiture *in Rem* alleges, upon information and belief, as follows:

### NATURE OF THE ACTION AND DEFENDANTS *IN REM*

1.      This is a civil action *in rem* for the forfeiture to the United States of approximately

$475,405.21 ("Defendant Funds") pursuant to 18 U.S.C. § 981(a)(1)(A) and (C).   Upon

information and belief, and as alleged herein, the Defendant Funds are the proceeds of the

operation by Joseph Szlavik ("Szlavik") of an unlicensed international money transmitting

business in violation of 18 U.S.C. § 1960, and constitute property involved in a transaction in

violation of 18 U.S.C. §§ 1956(a)(1)(A) and 1957.  As part of this unlicensed international money

transmitting business, Szlavik unlawfully transmitted money within the United States and to

locations abroad for several different clients, using numerous different bank accounts at various

financial institutions—to include the defendants *in rem* totaling approximately $475,405.21—for

financial gain.

### DEFENDANTS *IN REM*

2.      The defendants *in rem* were seized from nine financial accounts in the United States

at various financial institutions, and are more fully described as follows:

> a.  Approximately $215,587.22 seized from Citizens Bank Business Checking
>     Account #100606401387436 held in the name of JJ Szlavik Companies, Inc., (the
>     "**Citizens Bank Account**");
>
> b.  $10,174.52 seized from Wells Fargo Checking Account #2045233794 held in the
>     name of Joseph Szlavik at Wells Fargo Bank (the "**Wells Fargo Account**");

  c. $27,835.09 seized from TD Ameritrade Brokerage Account #873653221 held in the name of Joseph Szlavik (the "**TD Brokerage Account**")

  d. $72,000.00 seized from TD Ameritrade Individual Retirement Account ("IRA") #784051843 held in the name of Joseph Szlavik (the "**TD IRA Account**");

  e. $4,600.00 seized from Washington First Bank Business Checking Account #4100662 held in the name of Joseph Szlavik and/or Scribe Strategies and Associated (the "**Washington Account A**")

  f. $100.00 seized from Washington First Bank Account #1100769 held in the name of Joseph Szlavik (the "**Washington Account B**");

  g. $106,224.83 seized from Washington First Bank Account #3100650 held in the name of Joseph Szlavik (the "**Washington Account C**") (defendants *in rem* identified in ¶¶ 2(e–g) will be collectively referred to as, the "**Washington First Bank Accounts**");

  h. $25,000.00 seized from Morgan Stanley Smith Barney Account #22J-35212-11 held in the name of Joseph Szlavik (the "**Morgan Stanley Account**"); and

  i. $13,883.55 seized from First Niagara Bank Business Account #1367473 held in the name of Mercury Management, Inc. (the "**First Niagara Account**")

(collectively, "Defendant Funds" or "Defendant Accounts").

  3. On or about August 20, 2013, the Honorable Madeline Cox Arleo, United States Magistrate Judge for the District of New Jersey, found that probable cause existed to seize the Defendant Funds, and issued a warrant for their seizure. The funds were seized by the Department of Homeland Security, Homeland Security Investigations on or about September 24, 2013.

  4. Accordingly, the Defendant Funds reside in U.S. government holding accounts.

  5. The Defendant Funds are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C), as property derived from proceeds traceable to the commission of a violation of 18 U.S.C. § 1960—a "specified unlawful activity"—as defined in 18 U.S.C. §§ 1956(c)(7) & 1961(1).

  6. Additionally, this action is also brought, pursuant to 18 U.S.C. § 981(a)(1)(A), against the Defendant Funds seized from the Defendant Accounts, because the funds constitute

property involved in a transaction or attempted transaction in violation of 18 U.S.C. §§ 1956(a)(1)(A) & 1957.

## JURISDICTION AND VENUE

7.      This Court has original jurisdiction over an action commenced by the United States under 28 U.S.C. §§ 1345 & 1355(a) and 18 U.S.C. § 981(a)(1).

8.      This Court has *in rem* jurisdiction over the Defendant Funds pursuant to:

   a.  28 U.S.C. § 1355(b)(1)(A), because pertinent acts or omissions giving rise to the forfeiture occurred within the District of Columbia; and

   b.  28 U.S.C. § 1355(b)(1)(B), because venue properly lies in the District of Columbia pursuant to 28 U.S.C. § 1395(a).

9.      Upon the filing of this Complaint, and as set forth in Supplemental Rule G(3)(b)(i), Plaintiff requests that this Court issue an arrest warrant *in rem*, which the plaintiff will execute upon the property pursuant to 28 U.S.C. § 1355(d) and Supplemental Rule G(3)(c).

## STATEMENT OF FACTS

10.     Upon information and belief, between in or about February 2010 through August 2013, Szlavik conducted, controlled, managed, supervised, directed, and owned all or part of a business engaged in money transmitting in the District of Colombia, as defined in 18 U.S.C. § 1960(b)(2), and did so for multiple clients, each operating independently of each other, and collected a fee or commission for this service, all without the proper registration or license, in violation of 18 U.S.C. § 1960(a). Szlavik knowingly conducted, controlled, managed, supervised, directed and owned an "unlicensed money transmitting business" as defined in Section 1960(b)(1)(A) because he failed to obtain the required license in the District of Columbia as required under the District of Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq. Szlavik also knowingly, conducted, controlled, managed, supervised, directed and owned an

"unlicensed money transmitting business" as defined in Section 1960(b)(1)(B) because he failed to register with the Financial Crimes Enforcement Network ("FinCEN"), an agency within the Department of Treasury, as required under 31 U.S.C. § 5330(a); 31 C.F.R. § 103.41(a)(1) & (b).

11.     Szlavik committed these acts on behalf of customers located in multiple jurisdictions, including the United States, the Republic of Gabon ("Gabon"), Switzerland, and the United Arab Emirates ("UAE").   As set forth below, the primary focus of Szlavik's money transmitting business was to facilitate the transmission of funds from various persons and entities in Gabon, including for government officials in Gabon to dozens of businesses and individuals in the United States.

12.     Upon information and belief, also during this same time period, Szlavik conducted monetary transactions in excess of $10,000 through various federally insured banks in support of his unlawful money transmitting business, including the transfer of proceeds derived from his unlawful money transmitting business, in violation of 18 U.S.C. § 1957.

**Szlavik's Customers**

President Bongo of Gabon and His Family:

13.     Gabon is located on the west coast of sub-Saharan Africa.   Since its independence from France in 1960, Gabon has been ruled by three Presidents.   Ali Ondimba Bongo ("President Bongo" or "ABO") was elected President in 2009.   He succeeded his father, President Omar Bongo who served as President from 1967 through his death in 2009.   During his father's presidency, ABO served as Minister of Foreign Affairs from 1989 to 1991 and represented Bongoville as a Deputy in the National Assembly from 1991 to 1999; and Minister of Defense from 1999 to 2009.

14.     In February 2010, the United States Senate Permanent Subcommittee on Investigations ("PSI") issued a 323-page staff report detailing four specific cases of foreign public

officials using the U.S. financial system to conceal and launder the officials' ill-gotten gains.  One of these case histories focused specifically on President Bongo's family and their use of financial institutions in the United States to potentially launder the proceeds of official corruption.[1]

15.     On or about August 12, 2010, Szlavik was appointed "Conseiller Special" to President Bongo.  Slavik used this title on business cards and in email communications.  During this period from 2010 through 2013, Szlavik converted to his own use and benefit at least $300,000 in funds from Gabon.  It is believed that at least a portion of some of these funds are compensation for providing money transfer services.  Additional sums may reflect other services he provided for Gabon.  In the years 1992-94, Szlavik registered as an agent of Gabon under the Foreign Agents Registration Act ("FARA"), 22 U.S.C. §§ 611–621, but for no later periods.

16.     At all times relevant to this Complaint, Szlavik resided in Pennsylvania and operated a number of companies based in the District of Columbia and Pennsylvania.  These included The JJ Szlavik Companies ("Szlavik Companies"), a Pennsylvania corporation that was created on or about November 9, 1992 (and had previously been named Szlavik, Hogan & Miller, Inc.).  Additionally, Szlavik was the owner of Scribe Strategies & Consulting ("Scribe Consulting"), which was incorporated in Pennsylvania on or about November 11, 2001.  Most recently, Szlavik was the owner of Scribe Strategies & Advisors ("Scribe Advisors"), a firm that was incorporated in Pennsylvania on or about October 6, 2005.  These companies maintained offices in the District of Columbia.

---

[1] According to open source information, President Bongo is currently the subject of a criminal investigation in France.  In 2007, three French non-governmental organizations ("NGOs")—SHERPA, Survie, and Federation des Congolais de la Diaspora—filed a criminal complaint with the French public prosecutor alleging that President Bongo's family had acquired millions of dollars in assets in France with revenue stolen and/or misappropriated from the Gabonese government.  The Daily Mail, a U.K. newspaper, reported on May 27, 2010, that President Bongo acquired a 48,000-square foot mansion in Paris for approximately $135 million despite making less than $40,000 per month as a public official.

17.     At all times relevant to this Complaint, neither Szlavik himself, nor Szlavik

Companies, Scribe Consulting, nor Scribe Advisors, were licensed to conduct business as a money

transmitter in either the District of Columbia or Pennsylvania.

18.     Szlavik moved money into the U.S. for the Bongo family in violation of U.S. laws

at various times over many years.   In 1997, Szlavik pleaded guilty to one count of structuring in

violation of 31 U.S.C. § 5324(3), and agreed to forfeit $49,212 to the United States. *See generally*

*United States v. Szlavik*, 97-cr-058-JGH (D.D.C. Feb 10, 1997).   Szlavik admitted the following

facts which were alleged in the criminal Information to which Szlavik pleaded guilty, including 1)

that he and his wife made eight deposits of $7,500 each at eight different branches of Nations Bank

in the District of Columbia within a period of five hours, 2) that Szlavik represented to the Internal

Revenue Service that Pascaline Bongo, the daughter of the former president of Gabon and former

President Omar Bongo's chief of staff, provided these funds to him in the form of two blocks of

cash wrapped in plastic in Gabon, and 3) that he transported them into the U.S. at her request. *See*

*id.* ECF No. 1.   On May 7, 1997, the U.S. District Court for the District of Columbia sentenced

Szlavik to one year of probation and entered a final order of forfeiture with respect to $49,212 in

currency.

19.     As described below, Szlavik also participated directly in and arranged to smuggle

large amounts of cash into the United States. *See* ¶¶ 89-97.

Other Customers:

20.     In addition to receiving and transferring money in the United States at the request

of Bongo government officials, Szlavik also received and transferred money in the United States

on behalf of individuals associated with the government of Gabon and others.

I.   **Szlavik's Use of the Citizens Bank Account to Operate an Unlawful Money Transmitting Business**

A.   **Background Information**

21.   On or about March 14, 1997, in Pennsylvania, Szlavik opened the **Citizens Bank Account**, a business checking account, in the name of Szlavik Companies.  Szlavik listed an address in Harleysville, Pennsylvania in connection with this account.  Bank records for the **Citizens Bank Account** describe Szlavik Companies as a professional services firm.  Szlavik was listed as the owner of Szlavik Companies.

22.   In 2004, Szlavik obtained permission from Citizens Bank to use Citizens Bank to send wire transfers.

23.   On or about August 31, 2012, Citizens Bank requested that Szlavik provide the bank with more information about Szlavik Companies.  Szlavik responded that he, on behalf of a customer, was working on a promotion in Africa involving Soccer Player 1, a famous soccer player, and Promotion Company 1.  Szlavik brought a large stack of documents to the bank and explained that he used the **Citizens Bank Account** to send wire transfers and write checks in order to pay bills for his business.  Szlavik did not disclose that he was in the business of transmitting funds on behalf of others.

24.   In fact, this **Citizens Bank Account** was the primary account used by Szlavik to transfer funds on behalf of various third parties to multiple recipients in the United States.  As set forth below, the **Citizens Bank Account** received millions of dollars in funds from multiple sources located abroad, including: (1) an account held at Citibank in the name of the Republic of Gabon, (2) an account held at Citibank in the name of Citigalx in Gabon, (3) an account held at Abu Dhabi Commercial Bank in the UAE in the name of the Economic Exchange Centre in UAE, (4) an account held at UBS in the name of Originator 1 in Switzerland, (5) an account held at BGFI

Bank in the name of SA Finelec in Gabon, (6) and an account held at BGFI Bank in the name of ISIS[2] Investments in Gabon. Szlavik later transmitted these funds to various beneficiaries throughout the United States on behalf of numerous individuals. As compensation, Szlavik transferred a portion of these funds into personal bank accounts and investment brokerage accounts he maintained at various financial institutions in the United States.

25.     As set forth herein, because this account was used to conduct illegal financial transactions under 18 U.S.C. § 1960, all of the deposits received, including at least $215,587.22, and seized from this account are subject to forfeiture as proceeds of the unlicensed money transmission business pursuant to 18 U.S.C. § 981(a)(1)(C).

26.     Additionally, as set forth herein because the transactions conducted to fund the account were financial transactions involving proceeds of a specified unlawful activity in an amount exceeding $10,000.00, in violation of 18 U.S.C. § 1957, all of the funds seized from this account are subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(A).

### B.     Transmissions of Funds into Szlavik's Citizens Bank Account

27.     Between about January 2010 and March 2013, the **Citizens Bank Account** received deposits totaling approximately $8,352,309.81. Of that amount, approximately $7,512,764.44 — or about 90% of all deposits — were attributable to incoming wire transfers from sources outside the United States. In total, there were approximately nineteen incoming foreign wire transfers to the **Citizens Bank Account** sent by six different entities. Of these six entities, four were located in Gabon, one was in Switzerland, and another entity was located in the UAE. The wire transfers are detailed in Chart A below, and the six entities are discussed in turn:

---

[2]The United States has no evidence that this entity has a relationship to the Islamic State of Iraq and Syria, and actually preexisted the Islamic State by at least two years.

Chart A: Foreign Wire Transfers to the Citizens Bank Account

|    | Date | Amount | Originator of Wire |
|----|------|--------|---------------------|
| 1  | 2/23/2010  | $325,900.00   | Republic of Gabon Citibank NA Account ending 2167 |
| 2  | 6/22/2010  | $300,000.00   | Citigalx Account in Libreville, Gabon |
| 3  | 12/1/2010  | $400,000.00   | Citigalx Account in Libreville, Gabon |
| 4  | 2/3/2011   | $273,000.00   | Citigalx Account in Libreville, Gabon |
| 5  | 3/2/2011   | $89,973.00    | Economic Exchange Center, UAE Account ending 1001 |
| 6  | 4/28/2011  | $763,000.00   | Citigalx Account in Libreville, Gabon |
| 7  | 5/24/2011  | $39,980.00    | Originator 1 USB (Switzerland) Account ending 2895 |
| 8  | 8/30/2011  | $633,321.55   | Republic of Gabon Citibank NA Account ending 2167 |
| 9  | 12/29/2011 | $250,000.00   | ISIS Investment BGFI Bank (Gabon) Account ending 1120 |
| 10 | 1/30/2012  | $600,000.00   | SA Finelac BGFI BANK (Gabon) Account ending 0112 |
| 11 | 2/2/2014   | $672,244.89   | Republic of Gabon Citibank NA Account ending 2167 |
| 12 | 2/13/2012  | $650,000.00   | SA Finelac BGFI BANK (Gabon) Account ending 0112 |
| 13 | 2/24/2012  | $231,625.00   | ISIS Investment BGFI Bank (Gabon) Account ending 8501 |
| 14 | 6/1/2012   | $350,000.00   | ISIS Investment BGFI Bank (Gabon) Account ending 8501 |
| 15 | 6/12/2012  | $626,720.00   | Republic of Gabon Citibank NA Account ending 2167 |
| 16 | 9/11/2012  | $407,000.00   | Republic of Gabon Citibank NA Account ending 2167 |
| 17 | 11/7/2012  | $500,000.00   | Republic of Gabon Citibank NA Account ending 2167 |
| 18 | 2/14/2013  | $100,000.00   | ISIS Investment BGFI Bank (Gabon) Account ending 8501 |
| 19 | 3/8/2013   | $300,000.00   | ISIS Investment BGFI Bank (Gabon) Account ending 8501 |
|    | Total | $7,512,764.44 | |

a)   *Transfers From Republic of Gabon Citibank NA Account Ending 2167*

28.   Between on or about February 23, 2010 and November 7, 2012, the **Citizens Bank Account** received six wire transfers amounting to approximately $3,165,186.44 from a Citibank account in the name of the "Republic of Gabon" with an account number ending in 2167 (the "Republic of Gabon Account"). The Republic of Gabon Account constitutes the single largest source of funds transmitted into the **Citizens Bank Account**. The Republic of Gabon Account is located in Libreville, Gabon. Several of these wire transfers contained references to invoices to be paid using the funds wired in their ordering instructions. As set forth below, the sender's instructions to Szlavik about how to apply the proceeds was also contained in emails between Szlavik and his customers.

29.     On or about April 1, 2013, an e-mail (the "April E-Mail") was sent from Szlavik to an email account belonging to Arsène Emvahou.  The e-mail's subject line read "FW: Approved Payment by ABO from Joseph Szlavik -- attached - Paid 2 or 3 installments -- Notice #2."  The initials "ABO" in this context referred to President Bongo.  In the April E-Mail, Szlavik asked Emvahou to "confirm payment of the attached."  The April E-Mail further referred to an attached document containing "the expenses approved by the President two weeks ago."

30.     Documents attached to the April E-Mail included (1) an invoice from Szlavik dated February 22, 2013, requesting a wire transfer for $363,340 to the **Citizens Bank Account** for "Professional Services, Incurred & Approved Expenses;" and (2) a document titled "Expenses Incurred/Paid/Approved/Pending Joseph Szlavik March 25, 2013," which contained the following enumerated list of expenses:

| ITEM | AMOUNT/COST | DESCRIPTION | STATUS |
|---|---|---|---|
| Travel to Gabon | $ 31,400.00 | attachments | PAID |
| Travel to Brazil | $ 15,700.00 | IAD/GRU | PAID |
| Dental Liban | $ 11,406.40 | Balance | PAID |
| Payee 42 Dental | $ 4,000.00 | December | PAID |
| Service Academies | $ 6,000.00 | December | PAID |
| Musolino & Dessel | $ 19,700.00 | Legal Soccer Player 1 | PAID |
| London Travel Soccer Pl. | $ 12,900.00 | Travel | PAID |
| Travel to LA | $ 16,000.00 | Travel,Rooms, Auto Event | PAID |
| Derek Legal | $ 5,000.00 | Customs | PAID |
| Cadets Dental | $ 1,200.00 | Initial visit | PAID |
| | | | |
| Leaders Magazine | $ 175,000.00 | Leaders Magazine | PENDING |
| Travel to Brazil | $ 50,000.00 | License Transfer | PENDING |
| Sergey | $ 50,000.00 | Soccer Player,Omar,Airfare | PENDING |
| GARCIA & PHAM | $ 125,000.00 | Beneficiary 18/Dinner | |
| Pepito | $ 25,000.00 | Travel - Soccer Player | PENDING |
| Payee 42 | $ 15,000.00 | 2nd  & 3rd Qtr | PENDING |
| Legal | $ 100,000.00 | 2nd Qtr | PENDING |
| Consulting Fee | $ 300,000.00 | 2013 (1/2) | PENDING |
| | | | |
| *Paid Total* | *$ 123,306.40* | USD | |
| | | | |
| *Pending Total* | *$ 840,000.00* | **USD** | |
| | | Credit of 300,000 Feb 15 | |
| **AMOUNT DUE** | **$ 963,306.40** | USD | |
| | *663,306.40* | *NEW BALANCE* | |
| | *PAY $363,000.00* | *Installment #2* | |

31.    In or around May 2013, the **Citizens Bank Account** received a wire for $363,340—the amount requested by Szlavik in the April E-Mail—from the Republic of Gabon Account.

32.    In addition to the $300,000 "Consulting Fee" that Szlavik included for himself in this invoice, from approximately July 2010 through September 2011, Szlavik withdrew over $10,000 in cash from the **Citizens Bank Account** via automated teller machines in Gabon.

    b)    *Transfers From Citigalx Account in Libreville, Gabon*

33.     Between approximately June 22, 2010 and April 28, 2011, the **Citizens Bank Account** received four wire transfers totaling approximately $1,736,000 from an unidentified Citibank account in Gabon identified as "Citigalx" (the "Citigalx Account"). The wire transfer instructions for these transfers included sender or originating information referring to "Citigalx, Citibank N.A. Boulevard Quaben Et Rue Kringer, Libreville, GA." Citigalx is the SWIFT code— a code used by banks for international wire transfer activity—for Citibank in Gabon. The address listed on the wire transfer instructions is Citibank's address in Libreville, Gabon.

c)     *Transfers From Economic Exchange Centre, UAE Account Ending 1001*

34.     On or about March 2, 2011, the **Citizens Bank Account** received a wire for approximately $89,973 from an account at Abu Dhabi Commercial Bank in the UAE held in the name of the Economic Exchange Centre. This wire references "Sanedo General Trading - FZE EOC _E-NO 1646, Ajman UAE TL NO. 3884 Payment for Consultancy Fee." According to a website located at www.economicexchangecentre.com, the "Economic Exchange Centre was incorporated in April 2007 to cater to the ever growing money changing and remittance business in the Middle East. Economic Exchange Centre was granted an international money changing and remittance license by the Central Bank of UAE."

d)     *Transfers From Originator 1, UBS (Switzerland) Account Number Ending 2895*

35.     On or about May 24, 2011, the **Citizens Bank Account** received a foreign wire transfer for $39,980 from an account maintained by Originator 1 at UBS in Switzerland. Originator 1 is President of UAE Company 1. UAE Company 1 is described on the website of a company in which Originator 1 purportedly invested as "the investment vehicle of [Originator 1] and sons. The group's primary objective is to identify and develop high growth, sustainable business opportunities in Iraq that contribute to the development of the country's economy.

13

Current operations include food distribution, telecom distribution, power and O & M, logistics and manufacturing."

        e)    *Transfers From BGFI Bank Account Number Ending 1120*

36.    Between approximately December 29, 2011 and March 8, 2013, the **Citizens Bank Account** received five foreign wire transfers totaling approximately $1,231,625 from an account in the name of ISIS Investment at BGFI Bank (the "ISIS Investment Account"). BGFI Bank is a bank based in Libreville, Gabon. This account is believed to be used by the family of Omar Bongo. According to the 2010 PSI report, BGFI Bank was used in 2005 by Omar Bongo, the former Gabonese president, to transmit suspect funds to a lobbyist in the United States.

37.    Current President Bongo and Sylvia Bongo, the First Lady of Gabon, also used funds from the ISIS Investment Account to purchase jewelry in London and New York, respectively. Payment for the jewelry, totaling almost $4,000,000, was made via wire transfers from the ISIS Investment Account.

        f)    *Transfers From SA Finelec, BGFI BANK (Gabon) Account Number Ending 0112*

38.    The **Citizens Bank Account** also received two wire transfers from SA Finlec's account at BGFI Bank in Gabon. The first wire was for $600,000 on or about January 30, 2012. The second wire transfer was for $650,000 on or about February 13, 2012. SA Finelec is believed to be an energy company with operations in Africa.

**C.**    **Transmission of Funds from the Citizens Bank Account By Szlavik**

39.    Between approximately January 2010 through March 2013, a total of approximately $8,436,968.76 in funds were withdrawn, transferred, or paid by Szlavik from the **Citizens Bank Account** to multiple individuals and entities throughout the United States and abroad. These included approximately 183 wire transfers of amounts of $1,000 or greater, and

included seventy-six wires of amounts greater than $10,000, which were sent to over thirty different individuals and entities. These wire transfers, some of which are described in Chart B below, amounted to a total of approximately $5,579,365.38, reflecting approximately two-thirds of all withdrawals from the **Citizens Bank Account** from January 2010 through March 2013. As indicated in Chart B, Szlavik and his wife were the largest recipients of wire transfers from the **Citizens Bank Account**, receiving approximately $2,180,068.32 from this account during the time period described above. On information and belief, these payments for the Szlaviks' benefit include compensation for his operation of the illicit money transfer services as well as other services. The other wire transfers out of the Citizens Bank Account represent wire transfers Szlavik caused to be sent as part of his unlawful money services business.

Chart B: Wire Transfers from the Citizens Bank Account

| Wire Transfer Beneficiary | Wire Transfer Count | Total Amount of Wire Transfers |
|---|---|---|
| Beneficiary 1 | 4 | $56,990 |
| Beneficiary 2 | 1 | $50,000 |
| Beneficiary 3 | 1 | $15,000 |
| Beneficiary 4 | 1 | $22,500 |
| Beneficiary 5 | 2 | $125,000 |
| Beneficiary 6 | 1 | $12,000 |
| Beneficiary 7 | 1 | $6,465 |
| Beneficiary 8 | 12 | $30,200 |
| Derek Ashby | 8 | $290,130 |
| Beneficiary 10 | 1 | $1,000 |
| Beneficiary 11 | 1 | $3,000 |
| Beneficiary 12 | 1 | $74,000 |
| Beneficiary 13 | 3 | $12,000 |
| Inge Bongo/Inge Collins | 20 | $482,000 |
| Beneficiary 14 | 1 | $1,000 |
| Beneficiary 15 | 3 | $10,000 |
| Beneficiary 16 | 5 | $10,000 |

| | | |
|---|---|---|
| Beneficiary 17 | 1 | $1,500 |
| Joseph & Andrea Szlavik | 29 | $2,180,068.32 |
| Beneficiary 18 | 3 | $40,600 |
| Beneficiary 19 | 1 | $1,000 |
| Promotion Company 1 | 6 | $1,055,000 |
| Beneficiary 20 | 1 | $23,274.79 |
| Beneficiary 21 | 1 | $10,000 |
| Beneficiary 22 | 1 | $1,500 |
| Beneficiary 23 | 1 | $10,000 |
| Beneficiary 24 | 1 | $2,046 |
| Mercury Management Inc. | 1 | $50,000 |
| Beneficiary 26 | 2 | $10,000 |
| Beneficiary 27 | 1 | $100,000 |
| Beneficiary 28 | 1 | $5,000 |
| Beneficiary 29 | 1 | $1,500 |
| Beneficiary 30 | 1 | $1,000 |
| Beneficiary 31 | 1 | $231,000 |
| Beneficiary 32 | 44 | $130,450 |
| Beneficiary 33 | 1 | $2,000 |
| Beneficiary 34 | 1 | $49,500 |
| Beneficiary 35 | 1 | $30,000 |
| Scribe Strategies & Advisors | 5 | $36,491.27 |
| Beneficiary 37 | 1 | $72,000 |
| Beneficiary 38 | 1 | $1,000 |
| TD Ameritrade Inc. | 3 | $220,000 |
| Beneficiary 39 | 2 | $7,000 |
| Beneficiary 40 | 3 | $52,650 |
| Beneficiary 41 | 1 | $52,000 |
| Beneficiary 42 | 1 | $1,500 |
| **TOTALS** | **183** | **$5,579,365.38** |

40.     In addition to the wire transfers detailed in Chart B, from January 2010 through March 2013 Szlavik caused approximately 134 checks for amounts ranging from $1,000 to $210,000 to be paid from the **Citizens Bank Account**. The checks were used to pay over forty different vendors, individuals, and financial institutions as part of Szlavik's unlawful money

services business. These checks totaled approximately $1,327,058.44, constituting approximately 16% of all withdrawals from the **Citizens Bank Account** over the period January 2010 through March 2013. These 134 checks are detailed in Chart C below:

Chart C: Checks Drawn on Citizens Bank Account

| Check Payee | Check Count | Total Amount of Checks |
|---|---|---|
| American Express | 2 | $3,677.53 |
| Payee 1 | 1 | $7,500 |
| Payee 2 | 2 | $28,300.73 |
| Payee 3 | 1 | $2,307 |
| Payee 4 | 1 | $9,113 |
| Blue Cross Blue Shield | 1 | $1,101.30 |
| Payee 5 | 1 | $31,343 |
| Payee 6 | 2 | $6,500 |
| Cash | 3 | $10,500 |
| Payee 7 | 1 | $10,000 |
| Citizens Bank | 5 | $20,219.13 |
| Payee 8 | 1 | $1,315.46 |
| Payee 9 | 1 | $1,500 |
| Payee 10 | 2 | $4,568.18 |
| Payee 11 | 1 | $10,250 |
| Payee 12 | 4 | $13,209.30 |
| Payee 13 | 3 | $66,775.40 |
| Payee 14 | 3 | $9,000 |
| Payee 15 | 2 | $2,000 |
| FARA Registration Unit DOJ | 1 | $3,555 |
| Payee 16 | 5 | $59,815 |
| Payee 17 | 2 | $11,269 |
| Payee 18 | 1 | $2,575 |
| Payee 19 | 1 | $1,500 |
| Payee 20 | 1 | $20,014.68 |
| Joseph Szlavik | 12 | $196,359.53 |
| Payee 21 | 1 | $1,164 |
| Payee 22 | 6 | $12,190.64 |
| Payee 23 | 1 | $47,963.69 |

| | | |
|---|---|---|
| Payee 24 | 1 | $6,647.95 |
| Payee 25 | 2 | $14,500 |
| Payee 26 | 1 | $3,330.50 |
| Payee 27 | 3 | $3,000 |
| Payee 29 | 4 | $30,875 |
| Payee 30 | 1 | $1,000 |
| Payee 31 | 16 | $55,290.33 |
| Payee 32 | 1 | $2,024 |
| Payee 33 | 1 | $1,658.02 |
| Payee 34 | 2 | $100,000 |
| Payee 35 | 3 | $10,000 |
| Sprint | 1 | $1,601 |
| Payee 36 | 1 | $16,000 |
| Payee 37 | 5 | $33,464 |
| TD Ameritrade | 3 | $52,000 |
| Montgomery County Lands Trust | 1 | $1,000 |
| Payee 38 | 1 | $2,054 |
| Payee 39 | 5 | $5,300 |
| Payee 40 | 2 | $15,637 |
| Payee 41 | 6 | $119,000 |
| Payee 42 | 2 | $32,090 |
| Payee 43 | 1 | $10,000 |
| Payee 44 | 1 | $5,000 |
| Washington First Bank | 2 | $210,000 |
| **TOTALS** | **134** | **$1,327,058.37** |

41. Some or all of these aforementioned wire transfers (Chart B) and checks (Chart C) reflect transmissions of money from the **Citizens Bank Account**, on behalf of third parties, that were caused to be made by Szlavik and were received by third party entities as part of the operation of Szlavik's unlawful money services business as described below.

      a)    *Transfer of Funds to Promotion Company 1 from the Citizens Bank Account*

42. Between around January 7 and October 12, 2012, six wire transfers totaling approximately $1,055,000 were sent to Promotion Company 1's account at Washington First Bank

18

from the **Citizens Bank Account**. During the Relevant Period, as noted above in Chart B, Promotion Company 1 was the second-largest recipient of wire transfers from the **Citizens Bank Account**.

43.     As previously noted, in or around August 2012, Szlavik informed Citizens Bank that he was involved with a promotion in Africa involving Promotion Company 1 and Soccer Player 1. The wire transfers paid to Promotion Company 1 occurred approximately several weeks before the 2012 Africa Cup of Nations was held in Gabon, an event which, according to media coverage, Soccer Player 1 attended.

44.     Beneficiary 5 and Beneficiary 41 were the signatories on Promotion Company 1's account at Washington First Bank. **Beneficiary 5 is also an executive at Promotion Company 1.** Szlavik's role appears to be limited to receiving and transferring funds for that venture.

45.     Prior to approximately January 30, 2012, when the **Citizens Bank Account** received its first wire transfer for $600,000 from SA Finelec, the **Citizens Bank Account** had a balance of approximately $71,334. Later on the same day that the **Citizens Bank Account** received that wire transfer from SA Finelec, $250,000 in funds were wired from the **Citizens Bank Account** to Promotion Company 1's account at Washington First Bank. Approximately two days later, on or about February 1, 2012, a second wire transfer for $300,000 was sent from the **Citizens Bank Account** to Promotion Company 1.

46.     Upon information and belief, the funds used to pay Promotion Company 1 are traceable to the funds transmitted into the Citizens Bank Account by SA Finelec..

47.     On or about February 13, 2012, the **Citizens Bank Account** received its second wire transfer from SA Finelec, this one for approximately $650,000. The next day, a wire transfer

for approximately $150,000 was sent from the **Citizens Bank Account** to Promotion Company 1 at Washington First Bank.

48.     In addition to the wire transfers sent from the **Citizens Bank Account**, on or about August 30, 2011 and June 5, 2012, two wire transfers totaling approximately $125,000 were sent from the **Citizens Bank Account** to Beneficiary 5's personal account at Washington First Bank. As noted above, Beneficiary 5 was one of the signatories on Promotion Company 1's account at Washington First Bank.

49.     On or about July 13, 2012, another wire transfer for $52,000 was sent from the **Citizens Bank Account** to Beneficiary 41's personal account at Washington First Bank. As noted above, Beneficiary 41 was one of the signatories on Promotion Company 1's account at Washington First Bank.

50.     Additionally, on or about March 25, 2010, a check for $10,000 drawn on the **Citizens Bank Account** was paid to Beneficiary 41.

51.     In total, of the approximately $1,250,000 sent to the **Citizens Bank Account** from SA Finelec, $1,242,000 was transferred to bank accounts controlled by Beneficiary 5 and/or Beneficiary 41.

b)     *Transfer of Funds to Inge Lynn Collins-Bongo From the Citizens Bank Account*

52.     At all times relevant to this Complaint, Szlavik was also involved in transferring funds to Inge Lynn Collins-Bongo ("Collins-Bongo") in the form of wire transfers, checks, and cash on behalf of clients in Gabon, including current President Bongo. During the Relevant Period, as noted above in Chart B, Collins-Bongo was the third largest recipient of wire transfers from the **Citizens Bank Account**.

53.     Collins-Bongo is a U.S. national who has claimed that she is the estranged wife of President Bongo, whom she allegedly married in 1994.  President Bongo subsequently married a second time, to Sylvia Valentin, the current First Lady of Gabon, without formally divorcing Collins-Bongo.  At all times relevant to this Complaint, Collins-Bongo resided in California.

54.     In describing Collins-Bongo's prior banking history in the United States, the 2010 PSI Report explained that:

> [Collins-Bongo] opened an account in the name of the Collins Trust at Republic Bank California, which merged with HSBC Bank in 2000.  Neither Republic Bank nor HSBC was aware of her PEP ("Politically Exposed Person") status until two and a half years after the accounts were opened.  During those two and a half years, the Collins Trust accounts received over $650,000 in wire transfers from accounts in Gabon, Luxembourg, and Belgium, as well as hundreds of thousands of dollars from the Collins Trust account at Fidelity and from two California escrow agents.

The PSI report further noted that documents reviewed by the Senate staff "indicate that many of [Collins-Bongo's] accounts and transactions did not reference the name 'Bongo,' raising the question of whether [Collins-Bongo] was masking her connection to the Bongo family in Gabon when utilizing the U.S. financial system.  The Collins Trust accounts appear to be part of that effort."

55.     Between approximately January 27, 2011 and March 27, 2013, twenty wire transfers totaling approximately $482,000 were sent to Collins-Bongo at accounts she controls at JP Morgan Bank and Wells Fargo from the **Citizens Bank Account**, usually from funds sent from the Republic of Gabon Account following email requests from Collins-Bongo to Szlavik.

56.     For instance, on or about September 2, 2011—three days after the **Citizens Bank Account** received a wire transfer for $633,321.55 from the Republic of Gabon Account (noted in Chart B)—approximately $20,000 was wired from the **Citizens Bank Account** to Collins-Bongo's account at JP Morgan Bank.

57.     Similarly, on or about February 2, 2012, the Republic of Gabon Account wired

$672,244.89 to the **Citizens Bank Account**. On or about February 9, 2012, Collins-Bongo sent

an email to President Bongo's Chef de Cabinet, stating in part "I am STILL waiting on my wire."

Approximately one day later, a wire transfer for $20,000 was sent from the **Citizens Bank**

**Account** to Collins-Bongo's account at Wells Fargo Bank.

58.     On or about June 5, 2012, another wire transfer for $25,000 was sent to Collins-

Bongo from the **Citizens Bank Account**. On or about that same day, Collins-Bongo sent an email

to Szlavik stating:

> *Joe,*
>
> *You should know that the reason your friend was so eager yesterday to get some much needed cash to me is because I contacted Sylvia. I sent her a discreet message on Facebook urging her to speak to him before things got very ugly and she lit a fire under his butt. Two hours after I sent the message, you called me to assure me a wire will arrive today.*
>
> *With this in mind please know that you're in very good shape to negotiate high figures with fast and solid approaching dates to pay. Aim high Joe!*
>
> *You were right Joe, I do like Sylvia.*
> *Inge*

59.     Further, on or about March 6, 2013, Collins-Bongo sent Szlavik the following

email: "It's now 48 hours later n[sic] the wire should be here. I urge u[sic] to please forward funds

asap! My need is dire." Szlavik responded on or about March 6, 2013, to Collins-Bongo via email

stating: "No news as of today. Call u[sic] in 4 hours." Then, on or about March 7, 2013, Collins-

Bongo wrote again to Szlavik via email, inquiring: "Is the wire here? Please follow up on it for me

Joe, things are unraveling!" Later that same day, Szlavik responded to Collins-Bongo via email,

explaining: "I am on it. I have a call into the boss. I hope to speak with him in 2 hours. I will

call you." On or about March 14, 2013, a wire transfer for $50,000 was sent from the **Citizens**

**Bank Account** to Collins-Bongo's account at Wells Fargo Bank.

60.     Within two weeks of receiving this $50,000 wire from the **Citizens Bank Account**, Collins-Bongo acknowledged that Szlavik sent this money and, in an email to Szlavik, requested additional funds:

> *Joe,*
> *Please print and deliver this to the Boss for me.*
> *Thanks!*
>
> *Hi baby, [. . .] Please know that I appreciate very much your intentions by the monies u* [sic] *sent via Derek and the subsequent wire to make up for what was seized that also never arrived. I appreciate Joe too for floating me $50k while we try to sort it all out. But I need my money baby! All $200k that I detailed in my letter to you. [. . .] Please send cash with Joe ASAP cause I'm barely hanging on by a string.*

61.     Additional wire transfers of $30,000 and $50,000 were made on or about March 27 and March 30, 2013, respectively, from the **Citizens Bank Account** to Collins-Bongo.

### c)    *Transfer of Funds to Other Third Parties From the Citizens Bank Account*

62.     In addition to Promotion Company 1 and Collins-Bongo, Szlavik also orchestrated the transmission of funds into and within the United States for numerous other individuals and entities listed in Charts B and C, above. Some of these individuals and entities include:

i.     Beneficiary 2. On or about May 1 and September 12, 2011, two checks totaling $28,300.73 were paid from the **Citizens Bank Account** to Beneficiary 2. One check bore the memo "Ali Bongo Lunch Army/Navy Club." Additionally, on or about December 11, 2012, a wire transfer for $50,000 was sent to Beneficiary 2 from the **Citizens Bank Account**. Beneficiary 2 is a non-governmental organization based in the District of Columbia that focuses on foreign policy and international security issues.

ii.     Beneficiary 3. On or about September 2, 2011, a wire transfer for $15,000 was sent from the **Citizens Bank Account** to Beneficiary 3, listing an address in Miami, Florida. The wire instructions represented that these funds were being sent to Beneficiary

3 on behalf of Derek Ashby.  According to open source records, a Florida corporation

with the same name as Beneficiary 3 is a wholesaler dealing in electrical equipment and

supplies.  As explained in more detail below, Derek Ashby is a U.S. citizen residing in

Gabon who serves as an aide to President Bongo.

   iii.   Payee 6.  On or about October 28 and December 6, 2011, two checks

drawn on the **Citizens Bank Account** totaling $6,500 were paid to Payee 6.  The memo

lines on these checks state "ADBI, Burhan Soleman."  Payee 6 is an attorney in

Woodbridge, Virginia.  Burhan Soleman is a Gabonese financial analyst.

   iv.   Payee 11.  On or about December 7, 2012, a check for $10,250 drawn on

the **Citizens Bank Account** was paid to Payee 11.  Payee 11 is a periodontist in

Alexandria, Virginia.  The memo line states that this payment was being made on behalf

of a third party—namely, Soleman Liban, the former chief of staff to President Bongo (or

"Chef de Cabinet du Président de la République").

   v.   Derek Ashby.  Between approximately December 23, 2010, and August 8,

2012, eight wire transfers totaling $290,130 were sent to Ashby's bank account at Bank

of America.

   vi.   Payee 13.  Three checks dated June 29, 2012, August 21, 2012 and

December 13, 2012 respectively, were drawn on the **Citizens Bank Account** totaling

$66,775.40 and paid to Dr. John Kling.  Two of the checks referenced "Soleman Liban."

Dr. Kling is a dentist in Alexandria, Virginia.  Payee 13's website contained photographs

of dental work he performed on a patient named "Abdi-Soleman."  As alleged above, this

patient is believed to be the chief of staff to the President of Gabon.

   vii.   Beneficiary 12.  On or about March 20, 2012, $74,000 was wired from the

**Citizens Bank Account** to Beneficiary 12, a bank account believed to be used by a jeweler based in New York, which is the jeweler Sylvia Bongo purchased from, as noted above at paragraph 38. Less than four weeks before these funds were transmitted to Beneficiary 12, the **Citizens Bank Account** received a wire transfer for $231,625 on February 24, 2012, from the ISIS Investment Account.

viii.       Payee 42. Payee 42 is a private United States military academy. On or about November 21, 2012, three $1,000 wire transfers from the **Citizens Bank Account** were sent to Bank of America accounts in the names of three Gabonese cadets attending the private military academy. All three wire transfers listed the same payee address—the known location of the private military academy.

ix.       Beneficiary 20. On or about July 8, 2010, a wire transfer for $23,274.79 was paid to the Beneficiary 20 from the **Citizens Bank Account**. Additionally, on or about February 3 and February 22, 2010, two checks totaling $14,500 were also drawn on the **Citizens Bank Account** and used to pay Beneficiary 20, an attorney in Los Angeles, California. The memo lines state that these payments were being made on behalf of two individuals who are believed to be Gabonese citizens with ties to the Bongo family.

x.       Beneficiary 24. On or about December 24, 2010, a wire transfer of $2,046.66 from the **Citizens Bank Account** was sent to an individual, Beneficiary 24, in Belgium. A 1997 Washington Post article stated that Beneficiary 24 is the "son of a veteran Belgian diplomat to Africa, [and] is under investigation by authorities in his country for allegedly trying to sell intelligence documents to various African officials, including the daughter of the late Zairean dictator Mobutu Sese Seko."

xi.       Beneficiary 31. On or about February 9, 2012, a wire transfer for

$231,000 was sent to Beneficiary 31, an aircraft charter company based in Florida, from the **Citizens Bank Account**. The majority of these funds were used to pay for various chartered flights in February 2012 arranged by a company based in the United Kingdom, between, among other places: (1) Atlanta, Georgia and Madrid, Spain, and (2) Madrid, Spain and Libreville, Gabon.

       xii.        <u>Payee 36</u>. On or about March 5, 2011, a check drawn on the **Citizens Bank Account** for $16,000 was paid to Payee 36. The check's memo line read, "Gabon Embassy Rent, Legal & Court Fees, 2010LT." Payee 36 is a real estate attorney based in the District of Columbia.

       xiii.       <u>Payee 42</u>. On or about August 14 and October 22, 2012, two checks drawn on the **Citizens Bank Account** totaling over $32,090 were paid to the Payee 42 in Wayne, Pennsylvania. Both checks bore memos stating "Dental for Gabonese cadets."

       xiv.       <u>Payee 41</u>. Six checks, dated May 5, 2011, May 20, 2011, September 7, 2011, March 8, 2012, July 2, 2012, and August 23, 2012 respectively, were drawn on the **Citizens Bank Account**, totaling $119,000. These funds were paid to Payee 41, an entity based in the District of Columbia. The earliest check was for $50,000 and referenced "Retention Agreement for Gabon 777." Payee 41 is an international law firm specializing in aviation matters. The other five checks paid to Payee 41 were made for amounts varying between $4,000 and $20,000, and usually identified "rent" on the memo line. Payee 41's offices are located in Washington, D.C. Scribe Consulting has an office at the same address.

       xv.       <u>Gabonese Cadets Attending U.S. Military Academies</u>. Between approximately December 21 and December 26, 2012, four $1,500 wire transfers from the

**Citizens Bank Account** were sent to bank accounts in the names of four Gabonese cadets attending U.S. military academies. All four wire transfers listed the addresses of U.S. military academies under the beneficiaries' names, including the U.S. Naval Academy, Annapolis, MD; West Point, West Point, NY; and the U.S. Air Force Academy, Colorado Springs, CO.

**II.    Szlavik's Use of Additional Financial Accounts to Operate an Unlawful Money Transmitting Business Including to Transfer His Profits from this Unlawful Business and Other Business Activities**

63.    As described herein, on multiple occasions relevant to this Complaint, Szlavik transferred funds—that were directly traceable to or otherwise involved in Szlavik's operation of an unlawful money transmitting business—to other financial accounts that he controlled beyond the **Citizens Bank Account**, including accounts identified as containing the defendants *in rem*.

**A.    Transactions Involving the TD Bank Account**

64.    On or about January 17, 1996, Szlavik and his wife opened a joint personal checking account, account number 368227930, at TD Bank (the "TD Bank Account"). When opening the account, Szlavik listed an address in Harleysville, Pennsylvania.

65.    From approximately January 2011 through March 2013, approximately $1,240,068.32 in wire transfers and $196,362.53 in checks—for a total of $1,436,430.85—from the **Citizens Bank Account** were deposited into the TD Bank Account. These deposits accounted for approximately 81% of all deposits into the TD Bank Account during the same period.

66.    At one point in or around January 2011, the **Citizens Bank Account** was overdrawn and maintained a negative balance. On or about February 3, 2011, the **Citizens Bank Account** received a wire transfer of $273,000 from the Citigalx Account in Gabon. Approximately, one month later on or about March 2, 2011, the **Citizens Bank Account** received

another wire transfer of approximately $89,973 from Economic Exchange Centre in the UAE. After receiving the latter wire transfer, the closing balance in the **Citizens Bank Account** on or about March 2, 2011 was $252,224.19. Aside from these two incoming wire transfers, the only other deposits made into the **Citizens Bank Account** between February 3 and March 2, 2011 were approximately $201.80 in debit card refunds. On or about March 11, 2011, approximately $135,000 of the funds in the **Citizens Bank Account** were transferred to the TD Bank Account.

67.    On or about April 28, 2011, the **Citizens Bank Account**'s balance was approximately $6,000. Later that day, the **Citizens Bank Account** received a wire transfer of $763,000 from the Citigalx Account. On or about May 2, 2011, approximately $100,000 was wired from the **Citizens Bank Account** to the TD Bank Account. There were no other deposits made into the **Citizens Bank Account** between the receipt of the $763,000 wire transfer from the Citigalx Account on April 28, 2011, and the transfer of $100,000 from the **Citizens Bank Account** to the TD Bank Account on May 2, 2011.On or about November 2, 2010, the TD Bank Account received a direct wire transfer for approximately $166,000 from the Citigalx Account.

68.    On or about April 13, 2011 and August 16, 2011 respectively, two wire transfers totaling $40,000 were sent from the TD Bank Account to Collins-Bongo's account at JP Morgan Chase Bank.

69.    On or about October 2, 2012, TD Bank closed the TD Bank Account.

**B.    Transactions Involving The TD Ameritrade Accounts**

70.    On or about February 20, 2003, Szlavik opened TD Ameritrade brokerage account number 873653221 (the **"TD Brokerage Account"**). Szlavik was the sole signatory on the TD Brokerage Account.

71.   On or about September 26, 2005, Szlavik opened TD Ameritrade Simplified Pension IRA account number 784051843 (the "**TD IRA Account**").   Szlavik was the sole signatory on the TD IRA Account.

72.   On or about December 29, 2010, approximately $200,000 was transferred from the **Citizens Bank Account** to the **TD Brokerage Account**.  The funds in the **Citizens Bank Account** were mostly from a transfer from the Citigalx account in Gabon.  On or about November 30, 2010, the **Citizens Bank Account**'s balance was approximately $57,986.66.  The next day, and as noted above in Chart B, the **Citizens Bank Account** received a $400,000 wire transfer from the Citigalx Account.  No other deposits to the **Citizens Bank Account** were made until December 29, 2010, aside from a $59.70 debit card refund.

73.   Further, five wires dated on or about November 24, 2010, December 7, 2010, August 3, 2011, August 10, 2011, and June 26, 2012, respectively, totaling approximately $72,000, was transferred from the **Citizens Bank Account** to the **TD IRA Account**.

74.   Moreover, three transfers dated November 3, 2010, November 5, 2010 and March 16, 2011, respectively, totaling approximately $135,000, was transferred from the **TD Bank Account** to the **TD Brokerage Account**.

**C.**   **Transactions Involving the Wells Fargo Account**

75.   On or about September 6, 2012, several weeks before the **TD Bank Account** was closed—Szlavik opened a new checking account at Wells Fargo Bank, account number 2045233794 (the "**Wells Fargo Account**") into which he deposited funds from his unlawful money services business.  Szlavik opened the **Wells Fargo Account** in his own name with an initial deposit of a check for $25,000 drawn on the **TD Bank Account**.  Szlavik and his wife are listed as the signatories.

76.     Once the **Wells Fargo** Account was opened, Szlavik began to execute wire transfers from the **Citizens Bank Account** to the **Wells Fargo Account**. Between September 2012 and March 2013, six wire transfers totaling approximately $940,000 were sent from the **Citizens Bank Account** to the **Wells Fargo Account**. Additionally, on or about September 7, 2012, approximately $25,000 was transferred from the **TD Bank Account** to the **Wells Fargo Account**, and a total of approximately $178,000 was transferred from **TD Brokerage Account** to the **Wells Fargo Account** between approximately February and May 2013.

77.     Szlavik used money from the **Wells Fargo Account** to make payments for equipment, supplies, or labor for his personal residence. Many of these payments were for amounts greater than $10,000. In aggregate, these payments totaled over $1,000,000.

### D.     Transactions Involving the Washington First Bank Accounts

78.     In or around September 2010, Szlavik opened three bank accounts at Washington First Bank in Bethesda, Maryland: a business checking account (account number 4100662) ("Washington Account A") and two personal accounts (account numbers 1100769 and 3100650 ("Washington Account B" and "Washington Account C," respectively) (collectively, the **"Washington Bank Accounts"**) into which he deposited funds from his unlawful money services business. Szlavik was the sole signatory for each of the three **Washington Bank Accounts**.

79.     On or about September 9, 2010, an opening deposit of $10,000 was made into Washington Account A in the form of a check drawn upon the **Citizens Bank Account** which was funded with money Szlavik brought in from outside the United States.

80.     Also, on or about September 9, 2010, Szlavik made or caused to be made an opening deposit into Washington Account B in the form of a check for $200,000 drawn on the **Citizens Bank Account**. That same day, Szlavik transferred or caused to be transferred $199,900

of those funds to Washington Account C.

### E.   Transactions Involving the Morgan Stanley Smith Barney Account

81.   Beginning as early as approximately January 2010, Szlavik maintained an account at Morgan Stanley Smith Barney: account number 22J-3512-11 (the "**Morgan Stanley Account**") into which he deposited funds from his unlawful money services business.  Szlavik and his wife were the signatories on this account.

82.   On or about December 8, 2010, a $25,000 check drawn on funds from the TD Bank account was deposited into the **Morgan Stanley Account**.  This check was funded by proceeds from a $35,000 check from the **Citizens Bank Account** deposited into the TD Bank Account on December 2, 2010.  The balance in the **TD Bank Account** on December 2, 2010, after the $35,000 deposit, was approximately $80,916.89, and was reduced to $79,425.91 before the $25,000 check cleared on December 8, 2010.  There were no other deposits into the **TD Bank Account** between December 2 and 8, 2010.

### F.   Transactions Involving the First Niagara Bank Account

83.   Mercury Management, Inc. is a Pennsylvania corporation, of which Szlavik is listed the President.

84.   On or about July 16, 2001, Mercury Management, Inc. opened the **First Niagara Bank Account** at First Niagara Bank into which funds were deposited from his unlawful money services business.  Szlavik and his wife were signatories on the account.

85.   On or about May 18, 2010, July 28, 2010, March 15, 2011 and July 10, 2012, four checks which totaled approximately $30,875 were paid from the **Citizens Bank Account** to the **First Niagara Bank Account**.

86. Likewise, on or about January 31, 2013, a wire transfer for $50,000 was sent from the **Citizens Bank Account** to the **First Niagara Bank Account**.

### III. Bulk Cash Transfers of Money Into the United States for Further Distribution

#### A. Bulk Cash Deliveries to Collins-Bongo, an Associate of President Bongo in the United States

87. In addition to transmitting funds to Collins-Bongo via wire transfer, Szlavik also coordinated and participated in transferring large amounts of bulk cash currency into the United States for delivery to Collins-Bongo. Some of these funds were imported into the United States for delivery to Collins-Bongo in the U.S. by Derek Ashby ("Ashby"), a U.S. national residing in Gabon. Ashby is believed to serve as an aide to President Bongo, and advised United States Customs and Border Patrol ("CBP") officers that he shares a residence with Szlavik in Gabon. Such deliveries were usually coordinated by Szlavik.

88. Upon arrival to the United States on at least sixteen occasions since 2009, Ashby declared to CBP officers that he was importing in excess of $10,000 in currency into the United States. In total, Ashby has imported approximately $896,642 in cash into the United States since 2009. On twelve of these sixteen occasions, Ashby imported currency from Gabon amounting to approximately $648,246. On eight of these sixteen occasions, Ashby represented to CBP that he was importing these funds on behalf of President Bongo.

89. On or about November 14, 2012, Ashby arrived at Los Angeles International Airport ("LAX") on a flight from Gabon. Upon arriving in the United States, Ashby declared to CPB officials that he was carrying $150,000 in cash.

90. Approximately six days later, on or about November 20, 2012, Collins-Bongo emailed Ashby. The subject line on this e-mail read: "receipt and gratitude." The message read:

*Derek,*

> *Please allow this email to serve as receipt for the $100k I received on 14, November 2012.*
>
> *Please also deliver this message to the Boss:*
>
> *Dearest Ali,*
> *A brief note of thanks for your extraordinary generosity.*
> *You overwhelm me.*
> *My heart is full with appreciation, gratitude and love, seasoned with a healthy dose of longing for you.*
> *Thank you, thank you!*
> *Love,*
> *Inge*

91.     On or about March 1, 2013, Szlavik arrived at Dulles International Airport ("IAD") in Virginia returning from Gabon via Paris. Szlavik declared to CBP officers that he was in possession of $100,000 in U.S. currency. CPB officers verified the amount of the currency, which was in the form of one-hundred dollar bills wrapped in $10,000 bundles. Szlavik further explained to CBP officers that he was returning from Libreville, Gabon, where he said he received this currency from Navmar, a ferry service company he owned in Gabon. Szlavik represented to CBP that he intended to use these funds to purchase parts, pay for services, and handle payroll issues relating to Navmar. Because, according to Szlavik, wiring funds into the United States from Gabon could take up to 30 days to process, he elected to physically transport the currency directly into the United States. Szlavik did not disclose his relationship with the government of Gabon or President Bongo to CBP. While being examined by CBP officers, Szlavik requested that CBP expedite his inspection so that he could deposit these funds into a bank before the banks closed for the day. Bank records show that this money was not deposited into any of Szlavik's known bank accounts.

92.     Later that same month, on or about March 30, 2013, Szlavik met Collins-Bongo in the lobby of a condominium near Philadelphia, Pennsylvania. There, Szlavik transferred $80,000 of the $100,000 he personally imported that month from Gabon, retaining $20,000 as his fee.

B.   **Other Bulk Cash Deliveries From Gabon Into and Within the United States**

93.   On or about January 17, 2013, Szlavik arrived at Philadelphia International Airport returning from Gabon via Frankfurt, Germany.   Szlavik declared to CBP officers that he was in possession of $50,000 in U.S. currency.   Szlavik completed a Report of International Transportation of Currency or Monetary Instruments ("FinCEN 105") form indicating that he was carrying the $50,000 on behalf of a sports firm related to Soccer Player 1.

94.   On or about February 6, 2013, Ashby arrived at LAX on a flight from Paris, France. Ashby failed to declare to CBP officers that he was importing $154,244 in funds into the United States.   When a CPB officer discovered these funds, Ashby informed CBP officers that he was President Bongo's personal assistant and that the currency was going to be used to purchase food products in the United States for President Bongo.  Ashby also informed CPB officers that he lives in Gabon with another U.S. citizen, Joseph Szlavik, who also works for President Bongo.  Ashby explained to CBP that he expected Collins-Bongo to meet him at LAX that day.   On or about March 4, 2013, Szlavik received an email with a copy of a CBP receipt for seized property. This attachment described the seizure of the funds that Ashby sought to import into the United States on or about February 6, 2013.

95.   On or about August 19, 2013, Szlavik arrived at John F. Kennedy International Airport ("JFK") in Queens, New York on a flight from Gabon via Paris.  Szlavik declared to CPB officers that he was importing $50,000 in currency into the United States.  The currency consisted of fifty dollar bills wrapped in plastic.  Szlavik informed CBP officers that the money was from his business, Navmar.  Szlavik further explained to CBP that he had traveled to Gabon to meet with the U.S. Secretary of the Navy who was visiting Gabon, and to attend to Navmar-related business.  Szlavik advised that he personally imported the money because it would take four days

to wire the money, and that he was going straight to the bank to deposit the money, which he failed to do.

96.     At all times relevant to this Complaint, Navmar was a Gabon business that operated using Gabon's local currency—the Central African Franc—not U.S. dollars.  Moreover, at all times relevant to this Complaint, Szlavik was a minority owner of Navmar and did not have access to Navmar's business bank accounts and was not an authorized signatory for those accounts. Szlavik further did not receive a salary, dividend, or any other payments from Navmar. Additionally, Szlavik never advised his accountant of his ownership of Navmar.

### FIRST CLAIM FOR RELIEF

97.     The factual statements made in paragraphs 1 through 97 are re-alleged and incorporated by reference herein.

98.     The defendants *in rem* are property that constitute, or are derived from, proceeds traceable to a violation of 18 U.S.C. § 1960, a specified unlawful activity under 18 U.S.C. § 1956(c)(7)(A).

99.     Therefore, the defendants *in rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(C).

### SECOND CLAIM FOR RELIEF

100.     The factual statements made in paragraphs 1 through 97 are re-alleged and incorporated by reference herein.

101.     The defendants *in rem* are involved in, or are traceable to property involved in, a transaction or attempted transaction in violation of Section 18 U.S.C. § 1957.  Specifically, the defendants *in rem* are involved in a monetary transaction in criminally derived property of a value

greater than $10,000 and is derived from a specified unlawful activity, that is operating an unlicensed money transmission business in violation of 18 U.S.C. § 1960.

102. Therefore, the defendants *in rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### THIRD CLAIM FOR RELIEF

103. The factual statements made in paragraphs 1 through 97 are re-alleged and incorporated by reference herein.

104. The defendants *in rem* are involved in, or are traceable to property involved in, a transaction or attempted transaction in violation of 18 U.S.C. § 1956(a)(2)(A). Specifically, the defendants *in rem* constitute funds transmitted to a place in the United States from or through a place outside the United States with the intent to promote the carrying on of a specified unlawful activity, that is operating an unlicensed money transmission business in violation of 18 U.S.C. § 1960.

105. Therefore, the defendants *in rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### FOURTH CLAIM FOR RELIEF

106. The factual statements made in paragraphs 1 through 97 are re-alleged and incorporated by reference herein.

107. The defendants *in rem* are involved in, or are traceable to property involved in, a transaction or attempted transaction in violation of Section 18 U.S.C. § 1960. Specifically, the defendants *in rem* are involved in operating an unlicensed money transmission business in violation of 18 U.S.C. § 1960.

108.    Therefore, the defendants *in rem* are subject to forfeiture to the United States pursuant to 18 U.S.C. § 981(a)(1)(A).

### REQUEST FOR RELIEF

WHEREFORE, the plaintiff respectfully requests that warrants for arrest of the Defendants *in Rem* be issued; that due notice be given to all interested parties to appear and show cause why the forfeiture should not be decreed; that judgment be entered declaring the Defendants *in Rem* condemned and forfeiture to the United States of America for disposition according to law; and that the United States of America be granted such other and further relief as this Court may deem just and proper, together with the costs and disbursements of this action.

Respectfully submitted,

DEBORAH CONNOR, ACTING CHIEF
MONEY LAUNDERING AND ASSET
RECOVERY SECTION

By:

Woo Lee, D.C. Bar No. 486004
Deputy Chief
Patricia M. Sulzbach, D.C. Bar No. 979444
Trial Attorney
Marina C. Stevenson, D.C. Bar No. D00452.
Money Laundering and Asset Recovery Section
Criminal Division
U.S. Department of Justice
1400 New York Avenue, NW 10th Floor
Washington, DC 20530
Tel: (202) 514-1263
Fax: (202) 514-5522

Attorneys for Plaintiff
UNITED STATES OF AMERICA

## **VERIFICATION**

I, Geoffrey Gordon, a Special Agent of the Department of Homeland Security, hereby declare, under the penalty of perjury as provided for by 28 U.S.C. § 1746, that the forgoing Verified Complaint for Forfeiture *In Rem* is based on personal knowledge and information gained through interviews of witnesses and reports and information furnished to me by other law enforcement officers, and that the facts alleged therein are true and correct to the best of my knowledge and belief.

Executed on this __5th__ day of May, 2017.

GEOFFREY GORDON
Special Agent
Department of Homeland Security