# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Civil Action No. 1:17-cv-00853-CRC |
| | ) |
| | ) |
| $215,587.22 IN U.S. CURRENCY SEIZED FROM BANK ACCOUNT NUMBER 100606401387436 HELD IN THE NAME OF JJ SZLAVIK COMPANIES, INC. AT CITIZENS BANK, *ET AL.*, | ) |
| | ) |
| Defendants. | ) |

## CLAIMANTS JOSEPH AND ANDREA SZLAVIK'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS THE VERIFIED COMPLAINT FOR FORFEITURE *IN REM*

**DAVID B. SMITH, PLLC**

David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 722-1096
nds@davidbsmithpllc.com

## TABLE OF CONTENTS

I.  PRELIMINARY STATEMENT ........................................................................... 1

II.  FACTUAL BACKGROUND ............................................................................. 4

    A.  Claimant Szlavik's Consulting Firms ................................................ 4

    B.  Claimant Szlavik's Bank Accounts ................................................... 4

    C.  Republic of Gabon Background Allegations ..................................... 5

    D.  "Money Transmitting" Allegations ................................................... 6

        1.  Foreign wire transfers to the Citizens Bank Account ............... 6

            a)  Republic of Gabon Citibank NA Account Transfers ......... 6

            b)  Citigalx Account Transfers ................................................ 7

            c)  Economic Exchange Centre, UAE Transfer ....................... 8

            d)  "Originator 1," UBS (Switzerland) Transfer .................... 8

            e)  BGFI Bank, ISIS Investment Account Transfers .............. 9

            f)  BGFI Bank, SA Finelec Account Transfers ...................... 10

        2.  "Transmission" of Funds from Citizens Bank Account by Szlavik ... 10

            a)  Transfers to "Promotion Company 1" .............................. 12

            b)  Transfers to Inge Lynn Collins-Bongo ............................ 13

            c)  Transfers to Other Third Parties ...................................... 14

        3.  Szlavik's Alleged Use of Additional Accounts to Operate an Unlicensed Money Transmitting Business ............................. 16

        4.  Szlavik's Alleged Bulk Cash Deliveries from Gabon ............. 17

III.  ARGUMENT ............................................................................................... 18

    A.  Motion to Dismiss Standard ........................................... . ............... 18

    B.  The "Money Transmitting Business" Allegations Fail to State Claims for Relief ............................................................................ 19

        1.  Consultancies Are Not "Money Transmitting Businesses" ....... 19

## TABLE OF CONTENTS, Cont'd

  2.  The Complaint Fails to Properly Plead "Money Transmitting" in This Case ................................................. 28

 C.  All the Claims are Barred by the Statute of Limitations ................................... 30

 D.  The Money Laundering Claims Should Also Be Dismissed ................. 33

IV. CONCLUSION ................................................................... 34

Claimants Joseph and Andrea Szlavik, through their undersigned counsel, file this motion to dismiss the Verified Complaint for Forfeiture *In Rem* (ECF 1, the "Complaint"), pursuant to Federal Rule of Civil Procedure 12(b)(6) and Supp. Rule G(2)(f), because the Complaint fails to state a claim for forfeiture of the $475,405.21 at issue (the "Seized Assets") and does not allege facts sufficient to "support a reasonable belief that the government will be able to meet its burden of proof at trial." Supp. Rule G(2)(f).

## I.   **PRELIMINARY STATEMENT**

In this civil forfeiture action, the government seeks to forfeit $475,405.21 from Claimants Joseph and Andrea Szlavik, and from Mr. Szlavik's consulting companies, on the ground that he neglected to obtain a license to conduct a "money transmitting business" and to register that "business" with the Treasury Department.   The government contends that the Seized Assets, seized in September 2013 from Mr. Szlavik's bank accounts in Pennsylvania, are somehow related to that alleged unlicensed business.

Mr. Szlavik has never operated a money transmitting business.  For over twenty years, he has owned and managed consulting firms offering clients strategic consulting, government relations advice, and communications assistance.  His current firm, Scribe Strategies & Advisors ("SSA"), advises clients in such areas as defense and homeland security, business development, corporate affairs, P.R. and media consulting, and web technologies services.  Even a passing familiarity with SSA's business advertising reveals that it offers to the public no "money transmitting" services whatsoever.[1]  Indistinguishable from countless similar lobbying firms in the District, SSA caters to dozens of clients across a range of services.

---

[1] *See, e.g.*, Scribe Strategies & Advisors homepage at http://www.scribeus.com/services.html.

One is the Republic of Gabon in West Africa.  The Complaint alleges that Gabon's leadership is now out of favor in Washington D.C.  The gravamen of the Complaint appears to be that, between 2010-2013, Gabonese officials ordered wire payments to Pennsylvania bank accounts owned by Mr. Szlavik and his consulting companies, and that certain of these payments were then distributed by wire and check to beneficiaries in this country.  The government does not allege that any of the underlying payments were themselves illegal; many were earmarked for such prosaic matters as tuition for Gabonese cadets attending military academies in the U.S and contributions to a foreign policy NGO.  But, the Complaint alleges, "[i]t is believed" that "at least a portion" of these funds were paid to Mr. Slavik for providing "money transfer services." According to the government, this means Mr. Szlavik operated a "money transmitting business," as defined in 18 U.S.C. § 1960.  That statute criminalizes such businesses absent an appropriate license from the State where the business exists and registration with the Treasury Department.

In truth, the government is more interested in the Seized Assets due to their alleged link to the President of Gabon, who the government insinuates is corrupt, than for their involvement in "unlicensed money transmitting" in the U.S.  Indeed, the government undertook a three-year-long grand jury investigation into Mr. Szlavik's work in Gabon.  No criminal charges were brought.  The pretextual "money transmitting business" claims in this civil matter are almost certainly aimed at salvaging part of that investigation.  The Complaint fails to state a forfeiture claim, and must be dismissed, for several reasons.

*First*, it fails to properly plead that Mr. Szlavik operated a "money transmitting business" for which he would need a license.  Section 1960's definition section makes clear that the government cannot fit the square peg of his consulting business into the round hole of a "money transmitting business." Equally, its legislative history makes clear that Section 1960 was not

2

intended to cover consultancies that occasionally transfer funds while carrying out services that require making payments on behalf of the client.  If this Court were to hold that Mr. Szlavik's consultancy qualifies as a "money transmission business," hundreds of firms in this district – consulting, lobbying and legal – would be exposed to unforeseen criminal and civil liability.

*Second*, even if, as a matter of law, ordinary consulting and lobbying work could somehow qualify as a "money transmitting business," the Complaint fails to properly plead that the specific alleged transactions at issue *were* merely "money transfers" *tout court*, and not components of larger consulting services undertaken by Mr. Szlavik and his firms.  For over two-thirds of the Seized Assets, the Complaint pleads no "money transmission business" facts whatsoever.

*Third*, all of the government's claims are barred by the five year statute of limitations applicable to forfeitures under 18 U.S.C. § 981. The Complaint was filed on May 9, 2017.  But the money transmitting business allegedly began in February 2010.  Indeed, some 70% of the foreign wire transfers (by dollar amount) "transmitted" to U.S. beneficiaries were sent before May 9, 2012.  And according to the Complaint itself, the government knew, or should have known, of its claim after the Senate Permanent Subcommittee on Investigations issued a report describing, *inter alia*, the Gabonese President's alleged use of lobbyists to move money into the U.S.  There is no coincidence here: the Senate report was published in February 2010 – the same month the "money transmission business" allegedly began.

*Finally*, the government's money laundering claims should be dismissed (Second and Third Claims for Relief).  These are merely derivative of, and depend on the legal validity of, the underlying "money transmitting" claims.  As such, they too fail to properly plead claims under 18 U.S.C. § 1960.

II.     **FACTUAL BACKGROUND**

A.     **CLAIMANT SZLAVIK'S CONSULTING FIRMS**

The Complaint alleges that, since at least 1992, Claimant Szlavik has owned and operated various consulting businesses: the JJ Szlavik Companies ("Szlavik Companies"), incorporated in Pennsylvania in November 1992; Scribe Strategies & Consulting ("SSC"), incorporated in Pennsylvania in November 2001; and SSA, incorporated in Pennsylvania in October 2005.

All these are Pennsylvania businesses.  (ECF 1, ¶ 16.)  At all times relevant to the Complaint, Claimant Szlavik resided in Pennsylvania.  (*Id.*)

The sole connection to Washington D.C. alleged in the Complaint is that Szlavik's businesses at some point "maintained offices in the District of Columbia." (ECF 1, ¶ 16.)  The Complaint does not allege when the offices were maintained in Washington D.C.  It does not allege whether any of the "money transmitting business" allegedly performed by Claimant Szlavik was undertaken at or through the offices "maintained in the District of Columbia."  It does not allege any sort of business undertaken at the Washington D.C. offices.  (*Id.*)  The Complaint pleads no link between the District of Columbia offices and any of its allegations.

B.     **CLAIMANT SZLAVIK'S BANK ACCOUNTS**

It is further alleged that Claimant Szalvik, in his own name and on behalf of the Szlavik Companies, opened various bank accounts, all but one in Pennsylvania: (1) in March 1997, the "Citizens Bank Account," a business checking account, for the Szlavik Companies (ECF 1, ¶ 21); (2) in January 1996, the "TD Bank Account," a joint personal checking account (*id.*, ¶ 64); (3) in February 2003, the "TD Brokerage Account" (*id.*, ¶ 70); (4) in September 2012, the "Wells Fargo Account" (*id.*, ¶ 75); (5) in September 2010, a business checking account and two personal accounts, the "Washington Bank Accounts," at Washington First Bank in Bethesda, Maryland

(*id.*, ¶ 78); (6) in January 2010, the "Morgan Stanley Account" (*id.*, ¶ 81); and (7) in July 2001, the "First Niagara Bank Account," opened by "Mercury Management Inc.," a Pennsylvania corporation of which Claimant Szlavik is listed as president (*id.*, ¶ 83).

### C.    REPUBLIC OF GABON BACKGROUND ALLEGATIONS

The Complaint centers on Claimant Szlavik's services on behalf of the Republic of Gabon in general and for President Ali Ondimba Bongo in particular.  (ECF 1, ¶¶ 13-18.)  In broad strokes, it alleges that, since being elected President in 2009, Ali Bongo has committed some sort of official corruption and uses U.S. financial institutions to launder the ill-gotten gains.  (*Id.*, ¶ 14.)  The Complaint does not allege facts describing what the corruption consists of or in what manner or when the proceeds were laundered through this country; it cites instead an article from the U.K.'s Daily Mail, the Fleet Street tabloid newspaper (something like Britain's answer to the National Enquirer), reporting in 2010 that President Bongo owned a "mansion in Paris," notwithstanding a paltry official salary.  (*Id.*, ¶ 14 n. 1.)

Throughout, the Complaint indicates – but nowhere specifically alleges – that the government is more focused on the Seized Assets due to their alleged link to President Bongo than for their involvement in "unlicensed money transmitting" in the U.S.  (*Id.*, ¶¶ 13-96.)

The Complaint alleges that in August 2010, Claimant Szlavik was appointed "Conseiller Special" to President Bongo.  (ECF 1, ¶ 15.)  It further alleges that, between 2010-2013, Szlavik "converted to his own use" at least $300,000 in funds from Gabon.  (*Id.*)  The Complaint states "it is believed" that "a portion of some of these funds are compensation for providing money transfer services." (*Id.*)  The Complaint does not allege by whom this information "is believed."[2]

---

[2] The government does not use the familiar pleading formulation of "on information and belief." (ECF 1, ¶ 15.) Such a formulation would signify that a given allegation is "believed" to be true by the pleader, in this case the government.  Here, pleading in the passive voice, the government does not even allege by whom this information critical to its money transmitting business claim is "believed."

Nor does it allege what portion of "these funds" constituted compensation for "money transfer services."  In addition, the Complaint acknowledges that at least some portion of these funds "may reflect other services [Szlavik] provided for Gabon," *i.e.*, consulting services.  (*Id.*)  It fails to plead what portion of the referenced funds "reflect[s] other services," *i.e.*, other than alleged "money transmitting services."

### D.     "MONEY TRANSMITTING" ALLEGATIONS

#### 1.     *Foreign wire transfers to the Citizens Bank Account*

The Complaint alleges that, between January 2010 and March 2013, the aforementioned Citizens Bank Account, opened by the Szlavik Companies, received $7,512,764.44 in deposits attributable to nineteen wire transfers from sources outside the U.S.  (ECF 1, ¶ 27.)  These wire transfers were made by four entities in Gabon, one in Switzerland, and another in the UAE.  (*Id.*)

Of the nineteen wire transfers, thirteen occurred between February 23, 2010 and February 24, 2012, *i.e.*, more than five years before the Complaint was filed on May 9, 2017.  (ECF 1, ¶ 27 Chart A.) These thirteen wires account for $5,299,044.44 of the nineteen-wire total amount of $7,512,764.44 – or 70% of the total.

The nineteen wire transfers into the Citizens Bank Account are broken down as follows.

#### a)     *Republic of Gabon Citibank NA Account Transfers*

The Complaint alleges that, between February 23, 2010 and November 7, 2012, the Citizens Bank Account received six wire transfers totaling $3,165,186.44 from a Citibank account in the name of "Republic of Gabon." (ECF 1, ¶ 28.)  The Complaint states that these transfers are "the single largest source of funds transmitted into the Citizens Bank Account." (*Id.*)

6

Half of these transfers were made outside the five-year window before the Complaint was filed on May 9, 2017. (ECF 1, ¶ 27 Chart A.)

The Complaint alleges one fact in support of the government's contention that these six wire transfers constituted "money transmitting." (ECF 1, ¶ 28.) Specifically, the Complaint states that "several" of the six transfers "contained references to invoices to be paid using the funds wired in their ordering instructions." (*Id.*) The Complaint does not explain which transfers contained such "references." It does not allege why or how a "reference to an invoice to be paid" through the wire transfer means that Claimant Szlavik's services in connection with the transfer constituted illegal "money transmitting." The references to invoices to be paid show quite the opposite: Szlavik was not being paid a fee simply to transmit money to another person and pay out in the local currency.

The Complaint cites an email dated April 1, 2013 from Szlavik to one Arsene Emvahou (the "April Email"). (ECF 1, ¶ 29.) The alleged email's subject line is said to read: "FW: Approved Payment by ABO from Joseph Slavik – attached – Paid 2 or 3 installments – Notice #2." The Complaint does not allege who Mr. Emvahou is, or his connection to this case. Nor does it allege how or why the April Email is evidence of a "money transmitting business," as opposed to one part of a larger transaction for which Szlavik provided consulting and/or lobbying services.

The Complaint alleges that, in May 2013, the Citizens Bank Account received a wire from the Republic of Gabon account in the amount of $363,340 – the same amount allegedly requested by Szlavik in the April Email. (ECF 1, ¶ 31.) The Complaint does not plead that any of these funds were in fact transmitted to any other account, person or entity in the U.S.

### b)     *Citigalx Account Transfers*

The Complaint alleges the Citizens Bank Account received four wire transfers totaling approximately $1,736,000 from an unidentified Citibank account in Gabon identified as "Citigalx." (ECF 1, ¶ 33.)  The transfers were sent between June 22, 2010 and April 28, 2011. (*Id.*)

All of the Citigalx transfers were sent more than five years before the Complaint was filed on May 9, 2017. (*Id.*)  The Complaint alleges no facts to show these transfers were transmitted to any other account, person or entity in the U.S.  The Complaint cites no facts to show these wires were included in U.S. money transmitting.

### c)     *Economic Exchange Centre, UAE Transfer*

The Complaint alleges the Citizens Bank Account received a single wire for approximately $89,973 from an account at Abu Dhabi Commercial Bank in the UAE held in the name of the Economic Exchange Centre.  (ECF 1, ¶ 34.)  This wire allegedly references payment for a "Consultancy Fee." (*Id.*)  The transfer was sent on March 2, 2011.  (*Id.*)

The Economic Exchange Centre wire was sent more than five years before the Complaint was filed.   The Complaint alleges no facts to show this transfer was transmitted to any other account, person or entity in the U.S.  The Complaint alleges the wire references payment for a consultancy fee, not money transmitting services.  (*Id.*)  The Complaint does not explain how the UAE transfer relates to its Gabon allegations.

### d)     *"Originator 1," UBS (Switzerland) Transfer*

The Complaint alleges the Citizens Bank Account received a single wire transfer for approximately $39,980 from an account maintained by an unnamed "Originator 1" at UBS in Switzerland.  (ECF 1, ¶ 35.)  Originator 1 is the president of "UAE Company 1."  (*Id.*)  In turn,

UAE Company 1 is allegedly described on the website of a company in which Originator 1 invested as "the investment vehicle of [Originator 1] and sons.  The group's primary objective is to identify and develop high growth, sustainable business opportunities in Iraq that contribute to the development of the country's economy.  Current operations include food distribution, telecom distribution, power and O & M, logistics, and manufacturing."  (*Id.*)

The Originator 1/UBS transfer was sent on May 24, 2011, more than five years before the Complaint was filed on May 9, 2017. (*Id.*)  The Complaint alleges no facts to show this transfer was transmitted to any other account, person or entity in the U.S.  The Complaint alleges no facts to show the wire was included in U.S. money transmitting.   The Complaint does not explain how the Originator 1/UBS transfer relates to its Gabon allegations.

### e)       *BGFI Bank, ISIS Investment Account Transfers*

The Complaint alleges that, between December 29, 2011 and March 8, 2013, the Citizens Bank Account received five foreign wire transfers totaling approximately $1,231,625 from an account at BGFI Bank, based in Libreville, Gabon, in the name of "ISIS Investment." (ECF 1, ¶ 36.)  The Complaint states that "it is believed" the ISIS Investment account is "used by the family of Omar Bongo," a former president of Gabon.  (*Id.*)  It further alleges that BGFI Bank was used by Omar Bongo in 2005 to transmit "suspect funds to a lobbyist in the United States." (*Id.*)  The Complaint also alleges that the ISIS Investment account was used by President Ali Bongo and Sylvia Bongo, the First Lady of Gabon, to purchase jewelry in London and New York.  (*Id.*)

Of the five ISIS Investment wires, two were sent more than five years before the Complaint was filed on May 9, 2017.  (ECF 1, ¶ 27 Chart A.)  These two wires total $281,625.

9

(*Id.*)  The Complaint alleges no facts to show the five wires were transmitted to any other account, person or entity in the U.S.

### f)     *BGFI Bank, SA Finelec Account Transfers*

The Complaint alleges the Citizens Bank Account received two wire transfers from the BGFI Bank account of SA Finelec, an "energy company with operations in Africa." (ECF 1, ¶ 38.)  The first wire, in the amount of $600,000, was sent on January 30, 2012. (*Id.*)  The second, in the amount of $650,000, was sent on February 13, 2012.  (*Id.*)

Both SA Finelec wires were sent more than five years before the Complaint was filed on May 9, 2017. (*Id.*)  The Complaint alleges no facts to show these transfers were transmitted to any other account, person or entity in the U.S.  (*Id.*)  The Complaint cites no facts to show these wires were included in U.S. money transmitting.

### 2.     *"Transmission" of Funds from Citizen Bank Account by Szlavik*

**Wire Transfers.**  The Complaint alleges that, between January 2010 through March 2013, a total of $8,436,968.76 in funds were "withdrawn, transferred, or paid" by Szlavik from the Citizens Bank Account to "multiple individuals and entities throughout the United States and abroad." (ECF 1, ¶ 39.)  These included approximately 183 wire transfers in amounts of $1,000 or greater, and seventy-six wires in amounts greater than $10,000, which were sent to over thirty different individuals and entities. (*Id.*)

The 183 wire transfers amounted to a total of $5,579,265.38, reflecting approximately two-thirds of all withdrawals from the Citizens Bank Account from January 2010 through March 2013.  (ECF 1, ¶ 39.)  The Complaint alleges that Szlavik and his wife were the largest recipients of the transfers, receiving approximately $2,180,068.32 in this period.  (*Id.*)  These amounts

allegedly reflected payments to Szlavik and "include[d] compensation for his operation of the illicit money transfer services as well as other services." (*Id.*)

All of the other wire transfers – *i.e.*, beyond those Szlavik made to himself in compensation for his services – "represent wire transfers Szlavik caused to be sent as part of his unlawful money services business." (ECF 1, ¶ 39.)

It appears most of the 183 wires were sent more than five years before the Complaint was filed on May 9, 2017. (ECF 1, ¶ 39.)  The Complaint does not plead facts showing how these wires were in furtherance of an illegal money transmitting business.  Indeed, it does not even attempt to link specific payments made to Szlavik (in the Citizens Bank Account or elsewhere) with specific transfers made thereafter by Szlavik to beneficiaries.

**Check Transfers.**  In addition to the 183 wire transfers, the Complaint alleges that, from January 2010 through March 2013, Szlavik caused approximately 134 checks in amounts ranging from $1,000 to $210,000 to be paid from the Citizens Bank Account.  (ECF 1, ¶ 40.)  The checks totaled approximately $1,327,058.44, constituting approximately 16% of all withdrawals from the Citizens Bank Account between January 2010 through March 2013.  (*Id.*)

It appears most of the checks were paid more than five years before the Complaint was filed on May 9, 2017.  (ECF 1, ¶ 40 Chart C.)  The Complaint does not plead facts showing how the check payments were in furtherance of an illegal money transmitting business.  Indeed, it does not even attempt to link specific payments made to Szlavik with specific check payments made by Szlavik to beneficiaries.

The Complaint alleges specific transfers from the Citizens Bank Account as follows.

**a)**     ***Transfers to "Promotion Company 1"***

The Complaint alleges that, in August 2012, Szlavik informed Citizens Bank that he was "involved with a promotion in Africa involving Promotion Company 1 and Soccer Player 1." (ECF 1, ¶ 43.)  Promotion Company 1, according to the Complaint, was the second-largest recipient of wire transfers from the Citizens Bank Account.  (*Id.*, ¶ 42.)

These wire transfers were allegedly paid approximately several weeks before the 2012 Africa Cup of Nations was held in Gabon, which "Soccer Player 1" attended.[3]  (ECF 1, ¶ 43.) The Complaint alleges that, prior to January 30, 2012, when the Citizens Bank Account received its first wire transfer in the amount of $600,000 from SA Finelec, the account had a balance of approximately $71,334.  (*Id.*, ¶ 45.)  After SA Finelec's $600,000 wire to the Citizens Bank Account on January 30, 2012, Szlavik in turn sent a wire on the same day for $250,000 to Promotion Company 1's account at Washington First Bank.  (*Id.*)  On February 1, 2012, Szlavik sent a second wire for $300,000 to Promotion Company 1's account. (*Id.*)

The Complaint alleges, "on information and belief," that the "funds used to pay Promotion Company 1 are traceable to the funds transmitted into the Citizens Bank Account by SA Finelec." (ECF 1, ¶ 46.)  The Complaint does not allege any facts showing that these specific transactions constituted illegal "money transmitting," as opposed to legitimate transfers involved in a more comprehensive consulting project undertaken by Szlavik to help Gabon successfully host the Africa Cup tournament.

On February 13, 2012, the Citizens Bank Account received a second wire transfer from SA Finelec in the amount of $650,000.  (ECF 1, ¶ 47.)  The next day a wire in the amount of $150,000 was sent from Citizens Bank Account to Promotion Company 1 at Washington First

---

[3] "Soccer Player 1" is Pelé, the Brazilian forward, widely regarded as the greatest soccer player of all time.

Bank.  (*Id.*)  The Complaint does not allege any facts suggesting these legitimate transfers were in furtherance of an illegal money transmitting business.

The Complaint alleges that "Beneficiary 5" and "Beneficiary 41" were the signatories on Promotion Company 1's account at Washington First Bank.  (ECF 1, ¶ 44.)  Beneficiary 5 was also an executive at Promotion Company 1.  (*Id.*)  On August 30, 2011 and June 5, 2012, two wire transfers totaling approximately $125,000 were sent from the Citizens Bank Account to Beneficiary 5's personal account at Washington First Bank.  (*Id.*, ¶ 48.)  On July 13, 2012, a wire was sent for $52,000 from the Citizens Bank Account to Beneficiary 41's personal account at Washington First Bank.  (*Id.*, ¶ 49.)  On March 25, 2010, a check for $10,000 was drawn from the Citizens Bank Account and paid to Beneficiary 41.  (*Id.*, ¶ 50.)

The Complaint neither alleges that the transfers and checks from the Citizens Bank Account to Beneficiaries 5 and 41 were traceable to earlier SA Finelec wire transfers, nor does it explain how these transactions were in furtherance of an illegal "money transmitting business." (ECF 1, ¶¶ 48-51.)

### b) *Transfers to Inge Lynn Collins-Bongo*

The Complaint alleges Szlavik "was involved" in transferring funds from Gabon to Inge Lynn Collins-Bongo, a U.S. national "who has claimed she is the estranged wife of President Bongo, whom she allegedly married in 1994." (ECF 1, ¶¶ 52-53.)

The Complaint alleges that, between approximately January 27, 2011 and March 27, 2013, twenty wire transfers totaling approximately $482,000 were sent to Collins-Bongo at accounts she controls at JP Morgan Bank and Wells Fargo from the Citizens Bank Account, "usually from funds sent from the Republic of Gabon Account following email requests from Collins-Bongo to Szlavik." (ECF 1, ¶ 55.)

Because the Complaint does not set forth all of the alleged twenty wire transfers, it cannot be determined from the pleadings when they were sent.  However, of the Complaint's six examples of wire transfers from the Citizens Bank Account to Collins-Bongo, half were sent more than five years before the Complaint was filed on May 9, 2017.  (ECF 1, ¶¶ 55-61.)  The Complaint does not explain how these payments to Collins-Bongo evidence that Szlavik was conducting an illegal money transmitting business, as opposed to acting for President Bongo in a delicate matter in the U.S.

         c)     *Transfers to Other Third Parties*

Apart from Promotion Company 1 and Collins-Bongo, the Complaint alleges "money transfers" to several other third parties.  The majority of the following alleged transfers were sent more than five years before the Complaint was filed on May 9, 2017.  The Complaint does not explain how any of these transfers were in furtherance of an illegal "money transmitting business."

**Beneficiary 2.**  On May 1 and September 12, 2011, two checks totaling $28,300.73 were paid from the Citizens Bank Account to "Beneficiary 2," an NGO based in Washington D.C. that focuses on foreign policy.  (ECF 1, ¶ 62.)  One of these checks bore the memo "Ali Bongo Lunch Army/Navy Club." (*Id.*)  The Complaint does not allege the amount for that particular check.  Nor does it allege specific facts showing these checks constituted money transmitting.  On December 11, 2012, a wire transfer for $50,000 was sent to Beneficiary 2 from the Citizens Bank Account. (*Id.*)  The Complaint neither alleges this check is traceable to a Gabonese payment, nor that it constitutes a money transmission.

**Beneficiary 3.**  On September 2, 2011, a wire transfer for $15,000 was sent from the Citizens Bank Account to "Beneficiary 3," a Florida corporation that deals in electrical equipment at the wholesale level.  (ECF 1, ¶ 62.)  The wire instructions indicated the funds were being sent on behalf of Derek Ashby, who the Complaint alleges is an aide to President Bongo.  (*Id.*)  The Complaint does not plead a link between this wire and any Gabonese payment made to the Citizens Bank Account.

**Payee 6.**  On October 28 and December 6, 2011, two checks drawn from the Citizens Bank Account totaling $6,500 were paid to "Payee 6," an attorney in Woodbridge, Virginia. (ECF 1, ¶ 62.)  The checks state "ADBI, Burhan Soleman," who is allegedly a Gabonese financial analyst. (*Id.*)

**Payee 11.** On December 7, 2012, a check for $10,250 drawn on the Citizens Bank Account was paid to "Payee 11," a periodontist in Alexandria, Virginia. (ECF 1, ¶ 62.) The memo line states the payment was being made on behalf of a third party – Soleman Liban, former chief of staff to President Bongo. (*Id.*)

**Derek Ashby.** Between December 23, 2010, and August 8, 2012, eight wire transfers totaling $290,130 were sent to Ashby's bank account at Bank of America. (ECF 1, ¶ 62.)

**Payee 13.** Three checks dated June 29, 2012, August 21, 2012 and December 13, 2012 were drawn on the Citizens Bank Account totaling $66,775.40 and paid to Dr. John Kling, a dentist in Alexandria, Virginia. (ECF 1, ¶ 62.) Two of the checks referenced "Soleman Liban," President Bongo's chief of staff. (*Id.*)

**Beneficiary 12.** On March 20, 2012, $74,000 was wired from the Citizens Bank Account to a "Beneficiary 12," a bank account "believed to be used by a jeweler in New York, which Sylvia Bongo purchased jewelry from." (ECF 1, ¶ 62.)

**Payee 42.** On November 21, 2012, three $1,000 wire transfers from the Citizens Bank Account were sent to Bank of America accounts in the names of three Gabonese cadets attending the private military academy. (ECF 1, ¶ 62.)

**Beneficiary 20.** On July 8, 2010, a wire transfer for $23,274.79 was paid from the Citizens Bank Account to "Beneficiary 20," an attorney in Los Angeles, California. (ECF 1, ¶ 62.) On February 3 and February 22, 2010, two additional checks totaling $14,500 were paid to Beneficiary 20. (*Id.*) The memo lines state these payments were being made on behalf of "two individuals who are believed to be Gabonese citizens with ties to the Bongo family." (*Id.*)

**Beneficiary 24.** On December 24, 2010, a wire transfer for $2,046.66 from the Citizens Bank Account was sent to "Beneficiary 24," who, according to a newspaper article from 1997, is the "son of a veteran Belgian diplomat to Africa, [and] is under investigation by authorities in his country for trying to sell intelligence documents to various African officials…." (ECF 1, ¶ 62.) The Complaint alleges no facts connecting this payment to anything Gabon-related.

**Beneficiary 31**. On February 9, 2012, a wire transfer for $231,000 was sent from the Citizens Bank Account to "Beneficiary 31," an aircraft charter company based in Florida. (ECF 1, ¶ 62.) These funds "were used to pay for various chartered flights in February 2012 between Atlanta, Georgia and Madrid, Spain; and Madrid, Spain and Libreville, Gabon." (*Id.*)

**Payee 36.** On March 5, 2011, a check drawn on the Citizens Bank Account for $16,000 was paid to "Payee 36," a real estate attorney in Washington D.C. (ECF 1, ¶ 62.) The memo line read "Gabon Embassy Rent, Legal & Court Fees, 2010LT." (*Id.*)

**Payee 42.** On August 14 and October 22, 2012, two checks drawn on the Citizens Bank Account totaling $32,900 were paid to "Payee 42." (ECF 1, ¶ 62.) The checks bore the memo "Dental for Gabonese Cadets." (*Id.*)

15

**Payee 41.**  Six checks dated May 5, 2011, May 20, 2011, September 7, 2011, March 8, 2012, July 2, 2012, and August 23, 2012, were drawn on the Citizens Bank Account, totaling $119,000, and paid to "Payee 41," an international law firm specializing in aviation matters.  (ECF 1, ¶ 62.)  The Complaint notes that many of the payments were rent checks for SSA's office space in Washington D.C.  (*Id.*)

**Gabonese Cadets Attending U.S. Military Academies.**  Between December 21 and December 26, 2012, four $1,500 wire transfers from the Citizens Bank Account were sent to bank accounts in the names of four Gabonese cadets attending U.S. military academies.

### 3. *Szlavik's Alleged Use of Additional Accounts to Operate an Unlicensed Money Transmitting Business*

Apart from the Citizens Bank Account, the Complaint alleges Szlavik used additional bank accounts to operate an unlicensed money transmitting business.  (ECF 1, ¶¶ 63-86.)  Almost none of the examples set forth in the Complaint describe any manner of money transmitting.  Nearly all of the alleged transactions occurred more than five years before the Complaint was filed on May 9, 2017.  (*Id.*)

Specifically, the Complaint alleges that at various times between January 1996 and January 2010, Szlavik opened various personal and business checking accounts and brokerage accounts (the "Additional Accounts").  (ECF 1, ¶¶ 64-86.)  It alleges that wire transfers and check payments were made from the aforementioned Citizens Bank Account to the Additional Accounts.  (*Id.*)

However, the Complaint alleges no payments from the Additional Accounts to any "payee" or "beneficiary" in the United States, or anywhere else, as with the Citizens Bank Account.  (ECF 1, ¶¶ 64-86.)  The Complaint does not plead facts explaining how the Additional Account transactions could plausibly constitute illegal money transmissions.  The Complaint occasionally pleads that Szlavik "deposited [into the Additional Accounts] funds from his

unlawful money services business." (*Id.*, ¶¶ 75, 78, 81.)  However, it pleads no facts to support

that conclusion.

### 4.   *Szlavik's Alleged Bulk Cash Deliveries from Gabon*

Apart from wire transfers and checks, the Complaint alleges a series of bulk cash

deliveries Szlavik and others made from Gabon to individuals in this country.  (ECF 1, ¶¶ 87-

96.)  Some of these allegations center on Derek Ashby, the alleged aide to President Bongo.  (*Id.*,

¶¶ 87-90.)  The Complaint pleads no facts linking Szlavik to these deliveries except for the

conclusory allegation that "such deliveries were usually coordinated by Szlavik." (*Id.*, ¶ 87.)

The Complaint alleges that on March 1, 2013, after returning to the U.S. from Gabon,

Szlavik declared to CBP officers at Dulles International Airport that he was in possession of

$100,000.  (ECF 1, ¶ 91.)  Szlavik informed CBP that he received the currency from Navmar, a

ferry service company he owned in Gabon.  (*Id.*)  The Complaint alleges that later that month

Szlavik transferred $80,000 of the $100,000 he imported from Gabon to Collins-Bongo,

retaining $20,000 as his "fee."  (*Id.*, ¶ 92.)  The Complaint does not allege that Szlavik's

representation that the funds were from the ferry company was false.  It does not allege any facts

showing that this transaction constituted illegal money transmitting.

The Complaint alleges that on January 17, 2013, Szlavik arrived at Philadelphia

International Airport returning from Gabon.  (ECF 1, ¶ 93.)  Szlavik declared to CBP officers

that he was in possession of $50,000.  (*Id.*)  He completed a Report of International

Transportation of Currency or Monetary Instruments form indicating he was carrying the funds

on behalf of a sports firm related to Soccer Player 1, Pelé.  (*Id.*)  The Complaint does not allege

any facts showing this importation of money constituted illegal money transmitting or any other

offense.

On August 19, 2013, Szlavik arrived at John F. Kennedy Airport in Queens, New York on a flight from Gabon.  (ECF 1, ¶ 95.)  He declared to CBP officers that he was importing $50,000 into the United States.  (*Id.*)  He explained the money was from his ferry business, Navimar.  (*Id.*)  The Complaint does not allege any facts showing this importation of money constituted illegal money transmitting.

## III.   ARGUMENT

### A.   MOTION TO DISMISS STANDARD

Under Federal Rule of Civil Procedure 12(b)(6), the Court tests the legal sufficiency of a complaint by "taking note of the elements a plaintiff must plead to state [the] claim to relief, and then determin[ing] whether the plaintiff has pleaded those elements with adequate factual support to state a claim to relief that is plausible on its face." *Blue v. District of Columbia*, 811 F.3d 14, 20 (D.C. Cir. 2015) (*quoting Ashcroft v. Iqbal*, 556 U.S. 662, 675, 678 (2009)).  "[A] complaint [does not] suffice if it tenders 'naked assertion[s] devoid of further factual enhancement.'" *Iqbal*, 556 U.S. at 678 (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)).

The Court may grant a motion to dismiss on statute of limitations grounds "if no reasonable person could disagree on the date on which the cause of action accrued." *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1475 (D.D.C. 1998) (internal citation omitted).  In addition, Supp. Rule G(2)(f) provides that the complaint must "state sufficiently detailed facts to support a reasonable belief that the government will be able to meet its burden of proof at trial." *U.S. v. Mondragon*, 313 F.3d 862, 865 (4th Cir. 2002) (cited by the Advisory Committee's Note to Rule G(2)); *U.S. v. All Assets Held at Bank Julius Baer & Co.*, 571 F.

Supp. 2d 1, 16 (D.D.C. 2008) (Rule G(2)(f) carries forward *Mondragon* standard for determining

sufficiency of the complaint).

### B. THE "MONEY TRANSMITTING BUSINESS" ALLEGATIONS FAIL TO STATE CLAIMS FOR RELIEF

The First and Fourth Claims for Relief are predicated on violations 18 U.S.C. § 1960,

which proscribes the operation of an unlicensed "money transmitting business."  (ECF 1, ¶¶ 97,

106.)  The Claims should be dismissed, because (1) as a matter of law, consulting firms like Mr.

Szlavik's cannot satisfy Section 1960's definition of a "money transmitting business" and (2)

even if such firms could qualify as money transmitting businesses, the Complaint fails to

properly plead that the specific alleged transactions at issue *were* illegal "money transmissions,"

and not merely incidental components of larger consulting services undertaken by Mr. Szlavik

and his firms.

#### 1. *Consultancies Are Not "Money Transmitting Businesses"*

18 U.S.C. § 1960 imposes criminal penalties on anyone who "knowingly conducts,

controls, manages, supervises, directs or owns all or part of an unlicensed money transmitting

business." 18 U.S.C. § 1960(a).  It further provides that:

> As used in this section –
>
> > (1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and –
> >
> > > (A) is operated without an appropriate money transferring license in a State where said operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;

    (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or

    (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity;

    (2) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier . . . .

18 U.S.C. § 1960(b).

    The thrust of the Complaint is that, between February 2010 through August 2013, Mr. Szlavik's consulting business transformed wholly – or possibly in part – into a "money transmitting business" which did not obtain the required license from the District of Columbia (in violation of § 1960(b)(1)(A)) and from the Financial Crimes Enforcement Network ("FinCEN"), an agency within the Treasury Department (in violation of § 1960(b)(1)(B)). (ECF 1, ¶ 10.)

    The government's claim makes no sense. The Complaint itself admits that for over twenty years Mr. Szlavik owned and managed *consulting* businesses, including SSA. (ECF 1, ¶ 16.) More specifically, it acknowledges Mr. Szlavik was a consultant to President Bongo. (*Id.*, ¶ 15.) It admits Mr. Szlavik's businesses provided consulting services to Gabon and President Bongo that had nothing to do with "money transmitting." (*Id.*) SSA's business advertising reveals that it offers to the public no "money transmitting" services whatsoever. *See*, *e.g.*, Scribe Strategies & Advisors homepage at http://www.scribeus.com/services.html. The Complaint fails

utterly to plead what portion of Mr. Szlavik's compensation allegedly tied back to illegal "money transmitting" as opposed to consulting work.  (*Id.*, ¶ 15.)

Mr. Szlavik's sporadic forwarding of funds from his Gabonese client to U.S. beneficiaries does not somehow transform his consulting business into a "money transmitting business."  Undersigned counsel cannot locate a single instance in the relevant case law where an individual or entity has been investigated, much less found liable, for courtesy transfers incidental to the primary, nonfinancial business services.  Moreover, counsel cannot locate a single precedent where an individual or entity has been investigated or found liable for a "money transmitting business" that *caters solely to a single client and not the public* (as the government alleges here in connection with Gabon/President Bongo).

And for good reason.  If such incidental courtesies were sufficient to expose a nonfinancial service business to criminal liability under Section 1960, hundreds or thousands of firms in this District – consulting, lobbying and legal – would be exposed to immediate and unforeseen criminal and civil liability.[4]  Does a law firm become a "money transmitting business" when it accepts funds from a client, "transmits" them to an expert who has been retained for the case, and bills for the time? Is a matrimonial lawyer a "money transmitter" when he receives funds from his client, sends them by wire transfer to an estranged spouse, and then bills the time? Surely the government would answer "no" to these questions, but it is unclear how they are materially distinct from Szlavik's consulting work.

---

[4] If the government really believed Szlavik was violating § 1960 it would have given him some warning to that effect so that he could conform his conduct to the government's novel and bizarre interpretation of the statute by obtaining the necessary license and registration.  It is apparent that the government is just looking for some way, however dubious, to "get" Szlavik for the work he does representing Gabon, and to "justify" keeping the funds it wrongly seized from him in 2013.

This common sense interpretation is confirmed by Section 1960's reference to a related statute, 31 U.S.C. § 5330.  As seen above, a person or entity becomes an "unlicensed money transmitting business" when he, she or it fails to comply with the "money transmitting business registration requirements under *section 5330 of title 31, United States Code . . . .*" 18 U.S.C. § 1960(b)(1)(B) (emphasis added).  In turn, 31 U.S.C. § 5330 provides that, for purposes of that section, "money transmitting business" means:

> any business other than the United States Postal Service which –
>
> > (A) provides check cashing, currency exchange, or money transmitting or remittance services, or issues or redeems money orders, travelers' checks, and other similar instruments or any other person who engages as a business in the transmission of funds, including any person who engages as a business in an informal money transfer system or any network of people who engage as a business in facilitating the transfer of money domestically or internally outside of the conventional financial institutions system;
> >
> > (B) *is required to file reports under section 5313*; *and*
> >
> > (C) is not a depository institution (as defined in section 5313(g)).

31 U.S.C. § 5330(d)(1) (emphasis added).

In turn, 31 U.S.C. § 5313 sets forth which entities are "required to file reports," as referenced in 31 U.S.C. § 5330(d)(1)(B).  Section 5313, titled "Reports on domestic coins and currency transactions," provides:

> When a *domestic financial institution* is involved in a transaction for the payment, receipt, or transfer of United States coins or currency . . . . the institution and any other participant in the transaction the Secretary may prescribe shall file a report on the transaction at the time and in the way the Secretary prescribes . . . .

31 U.S.C. § 5313(a) (emphasis added).

Because the government does not even allege that Szlavik or his consulting businesses are "domestic financial institutions" (and they are not), it has failed to plead a violation of 18 U.S.C. § 1960(b)(1)(B), which, as seen above, requires a failure to comply with the requirements set forth under 31 U.S.C. § 5330 (the federal money transmitting business requirements). *See United States of America v. E-Gold, Ltd.*, *et al.*, 550 F. Supp. 2d 82, 94 (D.D.C. 2008) (holding that a Section 1960(b)(1)(B) violation may be pleaded only where the "money transmitting business" is a "financial institution" because of  Section 1960(b)(1)(B)'s reference to 31 U.S.C. § 5330 and 31 U.S.C. § 5313).

Legislative history also supports the commonsense interpretation.  Section 1960 was modeled on 18 U.S.C. § 1955, "Prohibition on illegal gambling business," which makes it a federal crime to operate a gambling business in violation of state law.  *E-Gold, Ltd.*, 550 F. Supp. at 89 (citing S. Rep. No. 101-460, at 15 (1990), reprinted in 1990 U.S.C.C.A.N. 6645, 6659).  As observed by the *E-Gold* court, "[a]lthough Congress could have proscribed all illegal gambling when it enacted 19 U.S.C. § 1955 [], it used the term 'business' because it evidently sought to proscribe only large-scale illegal gambling operations." 550 F. Supp. at 89.  The court quotes the House Judiciary Committee Report:

> The intent of section 1511 and section 1955 . . . . is not to bring all illegal gambling activity within the control of the Federal Government, but to deal only with illegal gambling activities of major proportions.  It is anticipated that cases in which their standards can be met will ordinarily involve business-type gambling operations of considerably greater magnitude than simply meet the minimum definitions.  The provisions of this title do not apply to gambling that is sporadic or of insignificant monetary proportions. It is intended to reach only those persons who prey systematically upon our citizens and whose syndicated operations are so continuous and so substantial as to be of national concern.

*E-Gold, Ltd.*, 550 F. Supp. at 89 (quoting H.R. Rep. No. 91-1549, at 53 (1970), reprinted in 1970 U.S.C.A.A.N. 4007, 4029).

As held by the *E-Gold* court in this district, "because Section 1960 was modeled on Section 1955, it can be inferred that Congress employed the term 'business' after 'money transmitting' in subsections (a) and (b)(1) of Section 1960 to indicate that Section 1960 was designed to tackle large-scale operations as opposed to small-scale or individual money transmitters." 550 F. Supp. at 89.  Here, Mr. Szlavik's businesses plainly do not qualify.  Not only are the alleged money transmissions not "systematic" or "syndicated," the government concedes they were allegedly performed *for a single client by a single "transmitter."*  The government does not even allege Mr. Szlavik offered "money transmission" services to the public, much less a large enough swath of the public "to be of national concern."

The legislative history also shows that Section 1960 was intended to regulate nonbank *financial* businesses, not consultancies or lobbying firms.  The Report of the Committee on Banking, Housing, and Urban Affairs in the Senate, accompanying the earliest iteration of Section 1960, categorizes money transmitters as "non-bank financial institutions." S. Rep No. 101-460, at 4 (1990).  In a section entitled "Regulation of money transmitters, check cashers, and *other nonbank financial institutions*" (emphasis added), the Report quotes Peter Nunez, the Assistant Secretary of the Treasury for Enforcement, testifying that "[i]t is undisputed that as Bank Secrecy Act compliance by banks has improved, drug money launderers have and will continue to turn to *nonbank financial institutions* to convert street currency into monetary instruments and even to transmit abroad the proceeds of drug sales." *Id.*, at 14 (emphasis added and internal brackets omitted).

At an earlier hearing, Senator Alphonse D'Amato, who first introduced the money transmitter legislation, stated that the bill had "two main targets, international wire transfers, and the largely *unregulated financial institutions*." Depository Institution Money Laundering

Amendments of 1990, S. Hrg. 101-905, at 2 (emphasis added).  Senator D'Amato further stated,

"[a]mong the bill's key provisions are: Section 2, drafted with the technical assistance of the

Treasury Department, provides for the identification of *non-bank financial institutions*.  Instead

of requiring *money transmitters* to register with Treasury, as the original draft of my bill

provided, the bill as introduced requires Treasury to issue regulations requiring that depository

institutions [] identify their *non-bank financial institution* customers – *money transmitters*…."

*Id.*, at 5 (emphasis added).  Similarly, in a statement to Committee on Banking, Housing and

Urban Affairs, Clyde Farnsworth, Jr., member of the Board of Governors of the Federal Reserve

System, stated: "The Federal Reserve believes that it is important to oversee the activities of

providers of *financial services*, including *money transmitters*, in order to ensure that they do not

serve as a vehicle for avoiding the controls applicable to *financial institutions*." *Id.*, at 165

(emphasis added).  None of the legislative history comes close to a suggestion that consultancies,

lobbying and law firms – nonfinancial business – would be considered "money transmitting

businesses."

That leaves the government's claim that Szlavik and his companies were unlicensed

money transmitting businesses under 18 U.S.C. § 1960(b)(1)(A), which pertains to *State* money

transmitting business licensing requirements.  Again, the Complaint alleges Mr. Szlavik and his

businesses failed to obtain the required license in Washington D.C. under the District of

Columbia Money Transmitters Act, D.C. Stat. §§ 26-1001 et seq. (the "DCMTA").  (ECF 1, ¶

10.)  The DCMTA provides that "no person shall engage in the business of money transmission

without obtaining a license issued by the Superintendent under § 26-1009…." D.C. Stat. § 26-

1002.  "Money transmission" is defined as "the sale or issuance of payment instruments or

engaging in the business of receiving money for transmission or transmitting money within the

United States, or to locations abroad, by any and all means, including by not limited to payment instrument, wire, facsimile, or electronic transfer." D.C. Stat. § 26-1001.

The state theory fails for several reasons.  First, the DCMTA's legislative history is quite clear that its purpose has nothing to do with nonfinancial consulting businesses like Mr. Szlavik's.  Mayor Anthony Williams submitted the proposed bill for the DCMTA to the Council of the District of Columbia on September 1, 1999.  *See* Ltr. from Mayor Anthony Williams to Council of the District of Columbia, dated Sept. 1, 1999.[5]  In a cover letter, Mayor Williams zeroed in on the specific problem: In the district, many moderate and low-income families relied on nonbank financial services to pay bills and remit funds to relatives, particularly those who recently immigrated from Central or South America and use specialized international fund transfer services.  *Id.*, p. 1.  The Mayor gave examples of these non-bank "money transmitters": "neighborhood convenience stores, supermarkets, pharmacies, gas stations and *other retail outlets*." *Id.* (emphasis added).  The national money transmitter companies are identified as: "CitiCorp, MoneyGram, Thomas Cook, Travelers Express, and Western Union." *Id.*  The bill was designed to ensure non-bank money transmission outfits complied with basic good business practices.

A Report submitted to the D.C. Council, dated January 20, 2000, is no less clear. *See* Report re: Bill-13-367: "Money Transmitters Act of 1999." ("DCMTA Report").[6] In the public hearing for Bill 13-67, the key witness was S. Kathryn Allen, Superintendent, Office of Banking and Financial Institutions, who testified in favor of the bill.  *Id.*, p. 7, Section IV. Summary of Public Hearing and Witnesses. "Ms. Allen related the need to enact new legislation to the fact that the non-bank money transmission industry has evolved to where the services that are now

---

[5] Available at http://lims.dccouncil.us/Download/7828/B13-0367-Introduction.pdf.
[6] Available at http://lims.dccouncil.us/Download/7828/B13-0367-COMMITTEEREPORT.pdf

being offered include: the exchange of foreign currency denominated checks; the issuance of

travelers checks; and the domestic and foreign transfer of funds by wire and payment orders []."

*Id.*  Ms. Allen cited the types of "money transmitters" she referred to: "CitiCorp, MoneyGram,

Thomas Cook, Travelers Express, and Western Union. . . . in addition, it is estimated that

approximately 100 to 200 other non-bank money transmitter groups also operate in the District."

*Id.*  In summary, the Money Transmitters Act was designed as a consumer protection law to

establish a "regulatory format focused on the safety and soundness of payment instrument issuers

and funds transmitters." Testimony of S. Kathryn Allen, Dec. 15, 1999, p. 4.

      This history reveals at least three fundamental ways in which the government misapplies

the money transmitting business law in this case.  In contrast to the money transmitting

businesses cited in the legislative history, the Complaint does not, and cannot, allege: (a) that Mr.

Szlavik offered money transmitting services *to the public*.  Instead, the Complaint alleges one

"customer" alone, Gabon/President Bongo; (b) that the money transmitting here was anything

more than *incidental to the primary business service (here, consulting)*; and (c) that the

enforcement purpose here is consumer protection.  To the contrary, it is precisely the "consumer"

of the "money transmission" – and *not* the transmission business –  with which the government is

concerned in this case: Gabon/President Bongo.  Superintendent Allen cited "approximately 100

to 200 other non-bank money transmitter groups [that] operate in the District [beyond the

national money transmitters]." DCMTA Report, p. 7.  If the D.C. Council contemplated

including consulting/lobbying/legal groups within the ambit of DCMTA, surely the number of

money transmitting businesses would not be "100-200," and there would have been

overwhelming opposition to the bill from firms in this city.

Second, the government's DCMTA theory under Section 1960(b)(1)(A) fails for another reason.  The sole connection to Washington D.C. alleged in the Complaint is that Szlavik's businesses at some point "maintained offices in the District of Columbia." (ECF 1, ¶ 16.)  Yet the Complaint fails to allege whether any of the "money transmitting business" allegedly performed by Claimant Szlavik was undertaken at or through the offices "maintained in the District of Columbia."  (*Id.*)  It does not allege any sort of business undertaken at the Washington D.C. offices.  (*Id.*)  The Complaint pleads no link between the District of Columbia offices and any of its allegations.  (*Id.*) Instead, it admits "at all times relevant to the Complaint, Szlavik resided in Pennsylvania." (*Id.*)

In sum, Section 1960 was not intended to apply to Mr. Szlavik's consulting business and neither was the DCMTA intended to apply. The First and Fourth Claims for Relief should be dismissed.

### 2.    *The Complaint Fails to Properly Plead "Money Transmitting" in This Case*

Even if consulting/lobbying firms that transmit funds for clients incidental to their primary services can somehow qualify as "money transmitting businesses" under 18 U.S.C. § 1960, the Complaint fails to plead that Mr. Szlavik's businesses *were* money transmitting businesses in the period at issue, February 2010 through August 2013.  (ECF 1, ¶ 10.)  Section II. D., *supra*, shows many instances where the Complaint fails to plead any money transmitting in the financial transactions it describes.  *See supra*, pp. 6 to 18.

Moreover, of the $475,405.21 in Seized Assets, $199,990 (*or nearly half*) was transferred to the Citizens Bank Account on August 28, 2013.  (*See* Declaration of David B. Smith, dated July 5, 2017, Exhibit A, Citizens Bank Account August statement.) But the Honorable Madeline Cox Arleo, United States Magistrate Judge for the District of New Jersey, issued a seizure

warrant for the funds on August 20, 2013, freezing the funds.[7]  (ECF 1, ¶ 3.)  The Complaint

fails to plead how nearly half of the funds at issue could constitute, or be derived from,

"proceeds traceable" to a money transmitting business (First Claim for Relief, 18 U.S.C. §

981(a)(1)(C)), or be involved in, or traceable to property involved in, a money transmitting

business (Fourth Claim for Relief, 18 U.S.C. § 981(a)(1)(A)).  These funds reached Szlavik's

account *after* Magistrate Arleo issued a warrant for the account's seizure, leaving no opportunity

to conduct further alleged "money transmitting" in this country.  In any case, the Complaint does

not plead any post-August 28, 2013 "money transfers" or attempted ones.

     In addition, the Complaint pleads two sets of transactions that have nothing to do with

Gabon or money transmitting.  First, the Complaint alleges a March 2, 2011 wire transfer for

$89,973 from an account at Abu Dhabi Commercial Bank in the UAE in the name of the

Economic Exchange Centre to Szlavik's Citizens Bank Account.  (ECF 1, ¶ 34.)  The Complaint

pleads no "money transmitting" whatsoever in connection with this transfer (there was none).

Second, the Complaint pleads a May 24, 2011 wire transfer for $39,980 from a UBS

(Switzerland) account maintained by "Originator 1" to the Citizens Bank Account.  (*Id.*, ¶ 35.)

Again, the Complaint pleads no "money transmitting" whatsoever in connection with this

transfer (and again, there was none).  Apparently, the government lumped these two transactions

into the Complaint solely because they were foreign wires.

     Taken together, the August 28, 2013 wire, and two additional foreign wires, total

$329,943 – or approximately *69% of the Seized Assets*. That is, for *over two-thirds of Seized*

*Assets*, the government has no argument whatsoever for forfeiture under either 18 U.S.C. §

---

[7] Thus, the Szlaviks have been deprived of the improperly seized funds for almost four years now.  If the Complaint survives this motion, Claimants intend to seek summary judgment on grounds of undue delay, in violation of their due process rights.  *See U.S. v. $8,850 in U.S. Currency*, 461 U.S. 555 (1983). That is an affirmative defense to civil forfeiture.

981(a)(1)(C) or (a)(1)(A).  In this Motion, Claimant Szlavik limits himself to facts pleaded on the face of the Complaint.  But were he to go behind the Complaint, the facts are even worse for the government.  Approximately $10,174.52 was seized from his Wells Fargo Joint Account. (ECF 1, ¶ 2.)  Half of these funds, taken from a joint account, belong to Andrea Szlavik, Mr. Szlavik's wife, who operates a realtor business.  Approximately $13,883.55 was seized from the First Niagara Bank Account – Mercury Management.  (*Id.*)  Mercury Management is a company that collects tenant rent for real estate.  Including these sums, the total funds at issue having nothing to do with "money transmitting" whatsoever would amount to $354,001.07 – or *three-quarters of the total Seized Assets.*

Even if, as a matter of law, a consulting business can somehow qualify as a "money transmitting business," the First and Fourth Claims for Relief should be dismissed because the Complaint fails to properly plead a money transmitting business in this case.

### C.   ALL THE CLAIMS ARE BARRED BY THE STATUTE OF LIMITATIONS

The federal statute of limitations for civil forfeiture suits, set forth in 19 U.S.C. § 1621, provides for a five year limitations period, running from the time the government "discovered" the alleged offense.  19 U.S.C. § 1621; *see also United States v. $515,060.42 in U.S. Currency*, 152 F.3d 491, 502-03 (6th Cir. 1998) (applying Section 1621 to forfeiture claim). Under this statute, an offense is "discovered" by the government upon actual discovery, or its possession of the means to discover the alleged offense, whichever occurs first.  *U.S. v. Kivanc*, 714 F.3d 782, 789 (4th Cir. 2013); *$515,060.42 in U.S. Currency,* 152 F.3d at 502-03; *U.S. v. James Daniel Good Property*, 971 F.2d 1376, 1381 (9th Cir. 1992), *aff'd in part, rev'd in part on other grounds*, 510 U.S. 43 (1993).

When the alleged offense is an "ongoing scheme," such as a money transmitting

business, the limitations period begins to run when the offense begins (and the government knew

or should have known of it), not when it ends.  *$515,060.42 in U.S. Currency*, 152 F.3d at 502-

03 (limitations period runs from time government first becomes aware of ongoing scheme, not

from date of particular offense that generated the seized property); *United States v. Suffield*

*Terrace*, 607 F.3d 504, 509 (7th Cir.) (observing that a gambling business is a "single continuing

offense" for which the limitations period begins to run when the offense begins, not when it

ends), *cert. denied*, 131 S. Ct. 493 (2010).

Here, the Complaint, filed on May 9, 2017, alleges the unlicensed money transmitting

business began in February 2010.  (ECF 1, ¶¶ 10, 27 Chart A.) More than that, of the nineteen

foreign wire transfers *into* the Citizens Bank Account alleged in the Complaint, thirteen were

transferred before May 9, 2012, or *70% of the total by transfer amount*.  (ECF 1, ¶ 27 Chart A.)

For the transfers (by check and wire) *from* the Citizens Bank Account to U.S. beneficiaries, the

Complaint does not provide comprehensive dating.  (ECF 1, ¶¶ 39 Chart B, 40 Chart C.)  But at

the very least the majority of these transfers by amount appear to have been made before May 9,

2012, as can be seen in the detailed transaction breakdowns in Section II. D., *supra*.

Accordingly, the alleged offense itself (by offense onset or even by the bulk of money

transmissions), beginning in February 2010, occurred more than five years before the Complaint

was filed on May 9, 2017.  The government was also on actual or inquiry notice of the offense in

February 2010.  That can be seen on the face of the Complaint.  The Complaint alleges that the

United States Senate Permanent Subcommittee on Investigations ("PSI") issued a 323-page staff

report "detailing four specific cases of foreign public officials using the U.S. financial system to

conceal and launder the officials' ill-gotten gains. One of those case histories focused

specifically on President Bongo's family and their use of financial institutions in the United

States to potentially launder the proceeds of official corruption." (ECF 1, ¶ 14.)

The PSI Report was issued in February 2010.  (ECF 1, ¶ 14.)  It is no coincidence that the

"money transmitting business" scheme alleged in the Complaint also began in February 2010.

(ECF 1, ¶¶ 10, 27 Chart A.)  That is because the PSI Report, detailing President Bongo's alleged

"use of the U.S. financial system to conceal and launder [his] ill-gotten gains," indicates the

government was then on inquiry notice of the offense alleged in the Complaint.  Indeed, the PSI

Report describes in high detail President Bongo's use of lobbyists and efforts to move money to

beneficiaries in the United States.  (Smith Decl., Exh. B, Keeping Foreign Corruption Out of the

United States: Four Case Histories, Majority and Minority Staff Report, pp. 106-171.)  President

Bongo, the report states, "transferred over $18 million to the bank accounts of a U.S. lobbyist

and then directed that lobbyist to wire transfer millions of dollars to accounts across the United

States and around the world on his behalf." (Smith Decl., Exh. B, pp. 171-172.)  The PSI

concluded that the President Bongo case history "shows how [the President] [took] advantage of

the U.S. financial system by using a U.S. lobbyist's bank account as a conduit for his funds."

(*Id.*, p. 142.)  These are identical to the government's allegations here.

In fact, one of President Bongo's beneficiaries cited in the PSI Report is Inge Collins

Bongo, the same "estranged wife" with whom the government alleges Mr. Szlavik dealt in this

capacity as a "money transmitter." (Smith Decl., Exh. B, pp.159-172.)

These facts plainly indicate the government was on inquiry notice of its claim as of

February 2010.  *See*, *e.g.*, *Sandza v. Barclays Bank Plc, et al.*, 151 F. Supp. 3d 94, 133-14

(D.D.C. 2015) (for inquiry notice question at the motion to dismiss stage, courts may take

judicial notice of news coverage, noting the existence of the information without analyzing

whether the information is true) (*citing Washington Post v. Robinson*, 935 F.2d 282, 291 (D.C. Cir. 1991)); *Staehr v. Hartford Fin. Servs. Group, Inc.*, 547 F.3d 406, 427 (2d Cir. 2008) (same); *Shah v. Meeker*, 435 F.3d 244, 250-51 (2d Cir. 2006) (affirming dismissal on limitations ground where the improper business practices that served as the basis for the complaint were specifically described in a *Fortune* magazine article); *Hughes v. Vanderbilt Univ.*, 215 F.3d 543, 548 (6th Cir. 2000) (finding on a motion to dismiss that two articles by each of Nashville's two leading newspapers, and a report by Nashville's CBS affiliate, were sufficient to trigger inquiry notice); *Alkasabi v. Washington Mut. Bank, F.A.*, 31 F. Supp. 3d 101, 109 (D.D.C. 2014) (because bank's bankruptcy was "widely publicized," and notice of its FDIC receivership was published in newspapers of general circulation, plaintiffs had constructive knowledge of those facts); *In re MBIA Inc.*, No. 05 Civ. 3514, 2007 U.S. Dist. LEXIS 10416 (S.D.N.Y. Feb. 14, 2007) (same) (collecting cases); *In re Ultra fem Inc. Sec Litig.*, 91 F. Supp. 2d 678, 693 (S.D.N.Y. 2000) (inquiry notice given by one *Bloomberg* news article and one public filing that disclosed the allegedly concealed negative information regarding defendants' wrongdoing); *see also Diamond v. Davis*, 680 A.2d 364, 389 (D.C. 1996) (under D.C. inquiry notice rules, a plaintiff need not be aware of every fact pertaining to its cause of action before the limitations period begins to run).

Because the alleged money transmitting business offense occurred more than five years before the Complaint was filed, and since the government discovered or should have discovered it in February 2010 (or certainly no later than May 2012), the Complaint should be dismissed.

### D.   THE MONEY LAUNDERING CLAIMS SHOULD ALSO BE DISMISSED

The Second and Third Claims for Relief are money laundering claims under 18 U.S.C. § 1957 (Second Claim) and § 1956 (a)(2)(A) (Third Claim).  (ECF 1, ¶¶ 101, 104.)  Both offenses plead for their requisite "specified unlawful activity" element the same unlicensed money

transmitting business offense that underpins the First and Fourth Claims for Relief. (*Id.*) Accordingly, because the First and Fourth Claims for Relief must be dismissed for all the foregoing reasons, the Second and Third Claims should also be dismissed.

## IV.    <u>CONCLUSION</u>

For all the foregoing reasons, Claimants move the Court to dismiss the Complaint and order the prompt return of the Seized Assets.

Dated: July 5, 2017                                     Respectfully submitted.

**DAVID B. SMITH, PLLC**

*/s/ David B. Smith*
David B. Smith (D.C. Bar No. 403068)
108 N. Alfred St.
Alexandria, VA 22314
Phone:(703)548-8911
Fax:(703)548-8935
dbs@davidbsmithpllc.com

Nicholas D. Smith (D.C. Bar No. 1029802)
7 East 20th Street
New York, NY 10003
Phone: (917) 722-1096
nds@davidbsmithpllc.com

*Attorneys for Joseph Szlavik*
*and Andrea Szlavik*

34