```
 1                  IN THE UNITED STATES DISTRICT COURT
                       FOR THE DISTRICT OF COLUMBIA
 2
          - - - - - - - - - - - - - - - x
 3        UNITED STATES OF AMERICA,
                                        CA No:  1:17-cv-00853-CRC
 4                     Plaintiff,
                                        Washington, D.C.
 5        vs.                           Wednesday, September 13, 2017
                                        11:04 a.m.
 6
          $215,587.22 IN U.S. CURRENCY
 7        SEIZED FROM BANK ACCOUNT
          NUMBER 100606401387436 HELD
 8        IN THE NAME OF JJ SZLAVIK
          COMPANIES, INC. AT CITIZENS
 9        BANK, et al.,

10                     Defendants.
          - - - - - - - - - - - - - - - x
11        _____

12                      TRANSCRIPT OF MOTIONS HEARING
              HELD BEFORE THE HONORABLE CHRISTOPHER R. COOPER
13                      UNITED STATES DISTRICT JUDGE
          _____
14        APPEARANCES:
          For the Plaintiff:      MARINA CARIN STEVENSON, ESQ.
15                                U.S. ATTORNEY'S OFFICE
                                  Asset Forfeiture/Money Laundering
16                                555 Fourth Street, NW
                                  Washington, DC 20530
17                                (202) 252-7811
                                  marina.stevenson@usdoj.gov
18
                                  PATRICIA MARIE SULZBACH, ESQ.
19                                DEPARTMENT OF JUSTICE,
                                  CRIMINAL DIVISION
20                                Asset Forfeiture & Money Laundering
                                  1400 New York Avenue, NW
21                                Washington, DC 20005
                                  (202) 616-5313
22                                patricia.sulzbach@usdoj.gov

23
          (CONTINUED ON NEXT PAGE)
24
          Proceedings recorded by mechanical stenography; transcript
25        produced by computer-aided transcription
```

```
1    APPEARANCES (CONTINUED):

2    For the Defendants:      DAVID BENJAMIN SMITH, ESQ.
                              SMITH & ZIMMERMAN, PLLC
3                             108 North Alfred Street
                              Alexandria, VA 22314
4                             (703) 548-8911
                              dbs@davidbsmithpllc.com
5
                              NICHOLAS D. SMITH, ESQ.
6                             SMITH & ZIMMERMAN, PLLC
                              7 East 20th Street, Suite 4R
7                             New York, NY 10003
                              917-722-1096
8                             nds@davidbsmithpllc.com

9    Court Reporter:          Lisa A. Moreira, RDR, CRR
                              Official Court Reporter
10                            U.S. Courthouse, Room 6718
                              333 Constitution Avenue, NW
11                            Washington, DC  20001
                              202-354-3187

12

13

14

15

16

17

18

19

20

21

22

23

24

25
```

```
 1                      P R O C E E D I N G S

 2              THE COURTROOM DEPUTY:  Your Honor, we're on the

 3      record for Civil Case 17-853, United States of America vs.

 4      $215,587.22 in U.S. Currency Seized, et al.

 5              Counsel, please approach the lectern and identify

 6      yourselves for the record.

 7              MS. STEVENSON:  Good morning, Your Honor; Marina

 8      Stevenson and Patricia Sulzbach for the United States.

 9              THE COURT:  Ms. Stevenson, how are you?

10              MS. STEVENSON:  Well.  Thank you, sir.

11              THE COURT:  Good.

12              MR. D. SMITH:  Good morning, Your Honor; David

13      Smith for the claimants.  With me at counsel table is

14      Nicholas Smith, my co-counsel, and Mr. Szlavik and Andrea

15      Szlavik, his wife.

16              THE COURT:  Okay.  Welcome to Washington,

17      everyone.

18              MR. D. SMITH:  Thank you.

19              THE COURT:  This is the family forfeiture firm; is

20      that correct?

21              MR. D. SMITH:  Yes, it is.  Thank you, Your Honor.

22              THE COURT:  Well, nice to have you.

23              Let me just review the procedural background of

24      the case, if I could.  And if I get anything wrong, please

25      let me know, okay?
```

```
1                  MR. D. SMITH:  Sure.  Should I sit down, Your

2       Honor?

3                  THE COURT:  You can stay there because we'll hear

4       from you first.

5                  MR. D. SMITH:  All right.

6                  THE COURT:  So the complaint was filed in March of

7       this year.  The allegation is that the subject funds are

8       subject to forfeiture as proceeds of money laundering.  The

9       underlying predicate crime is 18 USC 1960, which frankly is

10      a new one for me.  The claimants filed their verified claims

11      on June the 6th and followed up with a motion to dismiss on

12      July the 5th.

13                 The grounds for the motion.  There's a 12(b)(6)

14      ground.  The argument is that the businesses were legitimate

15      consulting businesses, and there's also a statute of

16      limitations argument, and that the money laundering counts

17      have to follow the dismissal of the other counts.

18                 The government responded with 6(G) special

19      interrogatories, and a motion for a protective order, which

20      is before the Court today, was filed a few days later.

21                 Is that generally the background of this portion

22      of the case?

23                 MS. STEVENSON:  Yes, Your Honor.  The only

24      correction the government would make is the complaint was

25      filed in May.
```

1          THE COURT:  The complaint was filed in May, okay.

2          All right.  Mr. Smith, please proceed.

3          MR. D. SMITH:  Yes, Your Honor.

4          Your Honor, I would like to bring a significant

5     new development to the Court's attention.  We're concerned

6     that the government is attempting to bring undue and

7     improper pressure on Mr. Szlavik to drop his claim or to

8     settle it by indicting him in the Eastern District of

9     Virginia on an unrelated false statement charge under

10    Section 1001 based on something he told Customs on

11    reentering the United States from a trip to Gabon

12    approximately four years ago.  We believe that this new

13    charge, which we haven't seen yet because he has not yet

14    been indicted, is baseless; that no false statements were

15    ever made by him to Customs.  And my hunch is it wouldn't

16    get past a Rule 29 motion at trial, but there it is.

17          On Monday, September 11th, at around 5:00 p.m.,

18    less than two days before this hearing we're at now, one of

19    the prosecutors, Ms. Sulzbach, informed Mr. Szlavik's old

20    criminal counsel, a guy named Barry Gross, who I believe

21    practices in Philadelphia, that she had just received

22    approval from Main Justice to indict Mr. Szlavik, and she

23    asked Mr. Gross whether he would like to stay the civil

24    forfeiture case pending those new developments.

25          Mr. Gross said, "Sorry, I don't represent

1    Mr. Szlavik in the civil forfeiture case so I can't deal

2    with that."  But we -- if she had asked us, I would have

3    said immediately, "No, we're not interested in a stay of the

4    civil forfeiture case," although I'm sure the government

5    would like to have a stay so they don't have to answer our

6    motion to dismiss.

7            What's happened or is about to happen is quite

8    possibly a violation of Rule 8.4 of the District of Columbia

9    Rules of Professional Conduct, which prohibits threatening

10   criminal charges solely to gain an advantage in a civil

11   proceeding.

12           And by the way, we had -- none of Mr. Szlavik's

13   lawyers had heard anything about a criminal charge since

14   early 2015.  That's when, you know, he had rejected their

15   earlier plea offer, and we thought the criminal case was

16   over and the investigation was over.

17           THE COURT:  Well, clearly the government cannot

18   file or threaten a criminal prosecution in aid of civil

19   litigation, but, as you know, sir, the standard for

20   approving that is very high.

21           MR. D. SMITH:  I know.

22           THE COURT:  And the government is entitled to a

23   presumption of good faith and, you know --

24           MR. D. SMITH:  And I'm not asking the Court --

25           THE COURT:  -- if and when an indictment issues,

```
 1      criminal counsel can certainly make that --

 2               MR. D. SMITH:  Absolutely, Your Honor.  I just

 3      wanted to inform you of these developments because I

 4      consider them to be somewhat alarming and also important in

 5      terms of what's going on in this case.  And I just would add

 6      as a strong footnote that what the government is doing may

 7      also run afoul of the constitutional prohibition on

 8      prosecutorial vindictiveness, which I know quite a bit

 9      about.

10               But we're not here to argue those issues today.

11      We haven't had time.  We need to investigate --

12               THE COURT:  Well, since you've raised them, if the

13      government would like to respond on that issue, feel free.

14               MR. D. SMITH:  Do you want me to stop now?

15               THE COURT:  Yes, please.  Have a seat.

16               MR. D. SMITH:  Yes, Your Honor.

17               MS. SULZBACH:  Thank you for the opportunity to

18      respond, Your Honor.

19               On Monday of this week, September 11th, I

20      personally did notify Mr. Barry Gross, who, to the

21      government's knowledge, is Mr. Szlavik's current lawyer for

22      criminal matters.  I also notified Mr. Nicholas Smith, who,

23      to the government's knowledge, is Mr. Szlavik's lawyer for

24      civil -- for this civil forfeiture case.  I need to correct

25      the statements that were just made.
```

1          I never spoke with Mr. Gross.  I was only able to

2     leave a message for him, and he has not yet returned my

3     telephone call.  I merely stated to Mr. Gross that the

4     indictment, which we had spoke about in June of this year,

5     had been approved; that is, that we have received internal

6     approvals to seek an indictment in the Eastern District of

7     Virginia, and we intend to do that.  I left that message for

8     him.

9          I then spoke with Mr. Nicholas Smith to relay the

10     same message.  Mr. Smith asked me for specific details of

11     the indictment, how long we had been planning this, and

12     claimed that it was new knowledge to him.

13          I then mentioned at that point that Mr. Gross and

14     I had a telephone conversation on June 12th of this year.  I

15     made contemporaneous notes in my folder to indicate that we

16     were still seeking approval for this indictment, which, by

17     the way, is the same indictment under the same set of facts

18     for which we had entered previous preindictment plea

19     negotiations in 2014, and those were somewhat protracted due

20     to assignments of new lawyers, et cetera.

21          So I relayed all of this to Mr. Smith, and, in

22     fact, Mr. Smith told me that I had provided him much more

23     information than he expected to receive.  And then the next

24     day, Mr. Nicholas Smith advised me by email that he was now

25     involved in the criminal case and would I please have all

1    communications regarding the criminal matter addressed to

2    both Mr. Gross and Mr. Smith, and I agreed to do so.

3              THE COURT:  Okay.

4              MS. SULZBACH:  And those are the facts surrounding

5    the call on Monday.

6              THE COURT:  Very well.

7              Well, the record's clear on the parties'

8    positions.  The Court obviously at this point doesn't have a

9    dog in the fight so we'll proceed with argument on the

10   motion.

11             MR. D. SMITH:  I will move on to the issues the

12   Court has raised.

13             Your Honor, before I turn to the actual three

14   questions the Court has asked, I would like to argue that

15   the motion that we've -- for protective order can be fairly

16   resolved without actually having to decide those three

17   questions.

18             To grant the protective order motion, the Court

19   need not forbid the government from serving standing

20   interrogatories.  The Court needs only to find that the

21   Szlaviks have established pleading-stage standing.

22             THE COURT:  Well, that's a very good point, and

23   that was the question that I had intended to pose first to

24   the government.

25             It seems fairly clear to me that the combination

1    of the allegations in the verified complaint along with the

2    verified claim certainly establish or meet the low bar of

3    standing at the pleading stage, and the question is, then,

4    do I have authority or what authority do I have simply to

5    order briefing on the motion to dismiss, resolve those

6    issues?  If I deny the motion to dismiss, you answer the

7    complaint, and if your answers to the complaint deny the

8    government's standing-related allegations, then we may have

9    a dispute as to whether there is standing or not.

10              MR. D. SMITH:  Uh-huh.

11              THE COURT:  But can't we resolve that issue after

12   any answer when the standing issues are joined?

13              MR. D. SMITH:  That's exactly our position,

14   that -- and we think that's the position that's established

15   by the case law, which distinguishes that between these

16   different stages of the case, the pleading stage and the

17   summary judgment stage, and then there's the trial stage in

18   some rare cases.

19              The actual summary judgment test is not difficult

20   to meet either.  It's not as --

21              THE COURT:  Some evidence, according to the --

22              MR. D. SMITH:  Some evidence, right.  And I would

23   say there's overwhelming evidence here to support standing;

24   so, you know, if the Court wishes to reach that summary

25   judgment issue, you can, and you can also say -- find that

1    even under the somewhat more demanding summary judgment

2    standard there's plenty of evidence here to deny the

3    government's request for summary judgment.  They haven't

4    made such a request; but if they did, they would lose.

5         So -- you know, and this is consistent with civil

6    cases generally.  Discovery is traditionally suspended

7    during the motion to dismiss cycle, and this is just common

8    sense because before the motion to dismiss is decided we

9    don't know whether there are cognizable claims in the first

10   place, which would necessitate burdensome factual discovery.

11        THE COURT:  The only concern I have with the

12   approach that I suggest is that Rule 6(G) -- or, excuse me,

13   Rule 6(A) is fairly limitless.  It says, "The government may

14   serve special interrogatories without the Court's leave at

15   any time after the claim is filed."  It doesn't say, you

16   know, "with good cause," "to the extent there's a dispute."

17   There's no limitation language in the rule, and I

18   anticipate -- let me finish first, okay? -- and I would

19   anticipate that that's the argument the government's going

20   to make.

21        Is there any case law or other precedent for

22   the -- you know, for granting a motion for the protective

23   order pending the resolution of a motion to dismiss, as I'm

24   suggesting here?

25        MR. D. SMITH:  Well, we think actually perhaps the

1    best authority or certainly one of the best cases is your

2    own decision in the *HSBC* case, which we've repeatedly cited.

3    That's the Thailand case involving Siriwan --

4              THE COURT:  There were no special interrogatories

5    involved in that case.

6              MR. D. SMITH:  Correct.

7              THE COURT:  It didn't come on a motion for a

8    protective order or a motion to quash.

9              MR. D. SMITH:  Well, that's all correct, Your

10   Honor, but Footnote 1 is the key there, and on Page 167, you

11   know, Siriwan was asking the Court to rule on a motion for a

12   stay, and the government was saying, "Well, she doesn't

13   have" -- "we have to test her standing first because we

14   challenge her standing."  And the government said, "We want

15   to take discovery on standing before you decide that motion

16   for a stay."

17              And the Court, without really much ado, said, "No,

18   I'm not" -- in Footnote 1, "I'm not allowing you to take any

19   discovery before I decide the motion for a stay because" --

20   and this -- you know, our case is much stronger than

21   *Siriwan*, but in *Siriwan*, the Court found correctly, in my

22   view.  Ms. Siriwan had standing because she had control over

23   one of the seven bank accounts that were involved in that

24   case.  One account out of seven.  And she had -- she didn't

25   claim to be the owner of the account.  She said, "Well, I

1    have access to it, and I've taken money -- I've withdrawn

2    money from that account for my own purposes." So, you know,

3    and she -- and the Court in, I believe, *Siriwan* relied on

4    this First Circuit case involving Whitey Bulger's brother,

5    if you recall. Same scenario. Bulger's brother took money

6    out of the account, and he was found to have standing.

7          So the Court found that because she had

8    established standing with respect to one of the seven

9    accounts, she thus had standing to challenge the forfeiture

10   of all seven of the accounts.

11         In our case, it's -- the government has conceded

12   that -- in the complaint itself that Mr. Szlavik has an

13   ownership interest in much of the property involved in this

14   case, not just one account. They talked about the money

15   he's received from Gabon in payment for his services as

16   belonging to him clearly, right? I mean, there's no

17   question about that.

18         So just based on that concession alone,

19   Mr. Szlavik has standing to challenge the forfeiture of all

20   of the money in this case on the logic of the *HSBC/Siriwan*

21   decision of Your Honor.

22         THE COURT: Well, the government alleged in that

23   case that she was simply a straw owner of the monies in the

24   account.

25         MR. D. SMITH: Yes.

1       THE COURT:  And that the accounts were truly

2  controlled by her parents.  And what I recall that I held

3  was that because of at least some of the allegations in the

4  complaint alleging that she did control, you know, some

5  transfers from the account, that that was sufficient to

6  establish standing, at least at the pleading stage.

7       MR. D. SMITH:  Yes.

8       THE COURT:  Here there doesn't -- and I'll ask the

9  government about this -- there doesn't seem to be a straw

10  ownership argument being made.  There seems to be an

11  argument being made that he's the actual owner of these

12  accounts and that they are the proceeds of illegal activity.

13  Is that fair?

14       MR. D. SMITH:  I'm not sure I understand Your

15  Honor's question.  Are you saying that the government is

16  making a stronger argument about standing than in *Siriwan's*

17  case?

18       THE COURT:  I think that may be correct.

19       MR. D. SMITH:  Well, I mean, their position is

20  they haven't even challenged standing yet, and they're just

21  trying to find some information -- get some information to

22  assess whether they should challenge his standing.

23       THE COURT:  Okay.

24       MR. D. SMITH:  And they've conceded an awful lot

25  necessarily in the complaint.  Plus, you know, I mean, just

1    on the face of things, these are accounts in Mr. Szlavik's

2    name.  They're controlled by companies in his name.  I mean,

3    he clearly has possession of all these properties.  I mean,

4    that's -- and he clearly has control over them.  And we

5    don't see any evidence that he doesn't own any of these

6    properties.  The government hasn't cited one shred of

7    evidence to indicate he doesn't own even one of these

8    properties.

9           So I think their case -- I mean, it's really

10   frivolous.  I mean, there's no other word for it.  And we've

11   cited a whole bunch of cases, and believe me I could cite

12   many more cases right now, including cases in this

13   courthouse -- not Your Honor's cases -- where the government

14   has made frivolous standing arguments time after time after

15   time.  The kleptocracy unit is famous for this.

16          So it's just a tactic, I think, to delay the

17   decision on the motion to dismiss because they don't have an

18   answer to the motion to dismiss, and they're just trying to

19   stave off a loss by running up the cost to Mr. and Mrs.

20   Szlavik tremendously.  They're hoping to deter them.  And I

21   see this new indictment as more of the same except more

22   powerful medicine to deter them from proceeding to defending

23   their property.

24          It pains me to say this, but that's the way -- the

25   only way I can see this case.  And I know a good deal more

1    about the history, you know, of this long criminal

2    investigation where they were constantly looking for some

3    charge to hang on the man, which they couldn't find, and

4    they came up --

5              THE COURT:  I read your briefs on that.

6              MR. D. SMITH:  I understand.

7              THE COURT:  Let me hear from the government.

8              MR. N. SMITH:  Your Honor, if I may, can I

9    directly answer one of Your Honor's questions about the

10   Court's power --

11             THE COURT:  So Generally one lawyer per motion.

12             MR. D. SMITH:  I'll make the point that he wants

13   to make, Your Honor.

14             THE COURT:  I'll give you rebuttal, okay?  Let's

15   hear from the government.

16             MR. D. SMITH:  Thank you, Your Honor.

17             MS. STEVENSON:  Good morning, Your Honor.  Thank

18   you.

19             THE COURT:  Good morning.

20             MS. STEVENSON:  Just to clarify, in the *HSBC* case

21   the accounts were in her name.  There was a motion for stay.

22   The discovery that was requested was a deposition.  The

23   United States is asking for 25 responses to interrogatories

24   and, I believe, 13 responses from Mrs. Szlavik.  We're not

25   asking for physical discovery.  We're simply asking for

1    answers to questions that are under oath.

2           THE COURT:  I understand.

3           MS. STEVENSON:  And to clarify, the complaint is

4    as it existed in 2014 when it was filed.  This complaint --

5    excuse me, 2013 when the money was seized.  The government's

6    understanding of these assets is four years old.

7           Nine of the interrogatories seek basic ownership

8    for the nine defendant accounts.  Three of the

9    interrogatories explain the relationship with three of the

10   corporations named in the corporation's account.  They seek

11   to understand Mr. Szlavik's role in the account.  Is he a

12   shareholder?  Is he an officer?  How is he related to these

13   accounts?

14          THE COURT:  But the complaint alleges -- there are

15   allegations throughout the complaint of both ownership and

16   control and distributions of funds.  Your argument really is

17   that -- and the complaint was filed in May.

18          MS. STEVENSON:  Yes, Your Honor.

19          THE COURT:  And it's verified.

20          MS. STEVENSON:  Yes.

21          THE COURT:  So that's evidence.

22          MS. STEVENSON:  Right.

23          THE COURT:  That's evidence of ownership and

24   control.  So, at least at the pleading stage, isn't standing

25   established?

1          MS. STEVENSON:  Well, Your Honor, the special

2     interrogatories are also designed to go beyond the pleading

3     stage.

4          THE COURT:  Right, okay.  And that was the point

5     of the minute order that we entered.

6          MS. STEVENSON:  Right.

7          THE COURT:  Okay.  Let's assume we're at summary

8     judgment --

9          MS. STEVENSON:  Yes, Your Honor.

10         THE COURT:  -- and the standard is as the D.C.

11    Circuit has said, some evidence of standing, and it's not --

12    you know, frankly I got reversed in *17,900*.  I would have

13    applied a higher standard, but the Circuit said no.

14         MS. STEVENSON:  Yes, Your Honor.

15         THE COURT:  It's just some evidence, okay?  And

16    if there's a verified complaint, which is evidence, that

17    Mr. and Mrs. Szlavik, at least with respect to one of the

18    accounts for Mrs. Szlavik, you know, are signatories, set up

19    the accounts, have dominion and control over the accounts,

20    have made transfers to and from the accounts, that the

21    accounts contain monies that they were paid by way of

22    commission and fees and expenses for running the illegal

23    business that you've alleged, and they file a claim and say,

24    "Yes, you bet we own those accounts," isn't that at least

25    some evidence that they own the accounts, and, therefore,

1    they have standing to file a claim and to pursue a motion to

2    dismiss?

3           MS. STEVENSON:  Well, Your Honor, in *$17,900*,

4    which I have read several times, they do say that the record

5    -- where the record only contains the government's verified

6    complaint and the claimant's responses to the government's

7    special interrogatories.  It doesn't even say anything about

8    the contents of the verified complaint.  It talks about the

9    fact that what the plaintiff has put forward -- because at

10   this point in time the plaintiffs are not party to this

11   litigation.  They're not entitled to their motion to dismiss

12   as a matter of right.  They're intervenors seeking to enter

13   this litigation, and so they must establish that.

14           THE COURT:  I understand, but at least at the

15   pleading stage, for them to challenge the sufficiency of

16   your pleading, which is all they've done at this point,

17   clearly there's standing at this point.

18           You know, let's put to the side whether

19   ultimately, at the summary judgment stage, there may be a

20   standing dispute.

21           MS. STEVENSON:  Yes, Your Honor.

22           THE COURT:  Same question that I asked the

23   claimants.  Is there anything that would prevent me to grant

24   their motion, decide the motion to dismiss, and then, if the

25   case goes forward, assess whether there's a genuine dispute

1     as to standing, and then allow you to take the -- or issue

2     the interrogatories at that stage?

3                MS. STEVENSON:  Yes, Your Honor, there is.  And

4     the place to begin is the beginning, which is with the rule

5     that says once this special -- that specifically outlines,

6     in instances where a motion to dismiss is filed and

7     subsequently special interrogatories are propounded, that

8     the motion to dismiss is stayed, and then later in the rule

9     it says the Court must decide, you know, if a motion to

10    strike is filed.

11               There's no pending motion to strike; that we're

12    simply waiting for responses to our Rule G(6)

13    interrogatories.

14               And part of standing is statutory standing, and I

15    can't even stand here at this moment with pending

16    interrogatories that the claimants are refusing to answer

17    and say they've established statutory standing because they

18    haven't met G(6), and pursuant to Rule G(8), they have to

19    meet both G(5) or G(6) or the government can move to strike.

20               And I would note, Your Honor, that in 2006 the

21    rules were actually changed, so it's my understanding that

22    prior --

23               THE COURT:  Hold on.

24               MS. STEVENSON:  Yes, Your Honor.

25               THE COURT:  Let me go back to that point.  You

1    said they haven't met statutory standing because they have

2    not yet met G --

3              MS. STEVENSON:  (6).

4              THE COURT:  -- (6).

5              MS. STEVENSON:  At any time before trial the

6    government may move to strike a claim or answer for failing

7    to comply with Rule G(5) or G(6).  And I believe we -- and

8    I'm sorry, Your Honor, that's rule G(8)(b) -- I'm sorry,

9    (c)(1)(A).

10             THE COURT:  All right.

11             MS. STEVENSON:  And frankly, Your Honor, it's

12   briefed probably better than I could do orally in our papers

13   about that.

14             But I would note that prior to 2006, Rule E(2)

15   controlled in these sorts of cases, and in the -- prior to

16   2006, when the rule change happened, yes, a motion to

17   dismiss is decided prior to the special interrogatories.

18   However, the rule was specifically changed, and Rule G was

19   added to permit for these special interrogatories to trump

20   the motion to dismiss.

21             THE COURT:  But here --

22             MS. STEVENSON:  Yes, Your Honor.

23             THE COURT:  -- taking the verified complaint and

24   the claim, what is the standing argument?  There's -- you

25   know, the purpose of discovery is to resolve -- is to elicit

1    facts that will resolve disputes.

2              MS. STEVENSON:  Yes, Your Honor.

3              THE COURT:  Disputed facts.

4              Here, where is there any dispute on the record as

5    to whether they have standing or not?  And therefore what

6    purpose do the interrogatories serve at this point?

7              MS. STEVENSON:  As I said, four years has come to

8    pass.  The government has been alerted to the fact that the

9    Szlaviks may have gotten a divorce.  We don't know.  I don't

10   know how --

11             THE COURT:  Let's put the divorce to the side --

12             MS. STEVENSON:  Okay.

13             THE COURT:  -- because that's potentially one

14   issue in relationship to one account.

15             MS. STEVENSON:  Yes, Your Honor.

16             THE COURT:  But someone signed this verified

17   complaint in May of this year.

18             MS. STEVENSON:  Yes, Your Honor.

19             THE COURT:  And the facts were true to the best of

20   the affiant's knowledge as of May this year.

21             MS. STEVENSON:  The facts in the complaint are all

22   alleged to have occurred in 2010 through 2013, I believe,

23   Your Honor, so those were all of the facts as they existed

24   in 2013.  The complaint was not updated to reflect any sort

25   of current ownership interest because, as my co-counsel

1    alluded, there were all kinds of negotiations going on,

2    there were several lawyer changes, that the body of facts

3    existed as it existed.

4         THE COURT:  Okay.  So your point, then, is that

5    because of the lapse in time, you're entitled to issue

6    interrogatories to test their current claim of ownership.

7         MS. STEVENSON:  Yes, Your Honor, and I would note

8    that Your Honor's own opinion -- and it's not published.  I

9    do have a copy for -- and likely because it's an op/ord.  In

10   the *One GE CF6-50C2 Aircraft Engines with Engine Serial*

11   *Number 517738*, Your Honor goes through a great deal of

12   analysis when a claimant -- somebody files a claim and

13   subsequently disavows ownership in the assets during the

14   litigation.  Now, that's what we're trying -- and I have a

15   copy of both interrogatories, if Your Honor is interested,

16   but they are very tailored.

17        There are 25 questions, as I said.  They talk to

18   Have you ever disavowed the property?  How are you connected

19   to the property?  How are you connected to the property

20   where there is -- it is in the name of a company?  So we

21   have alleged that there's a company.  I believe with one of

22   the accounts, Mercury Management, it's only in Mercury

23   Management.

24        So how are you connected to these accounts?  Do

25   you still have any ownership in these accounts?  Because if

1    they closed down, was some aspect of this conveyed in some

2    sort of settlement?  When -- interestingly it appears that

3    Ms. -- in our complaints, Ms. Szlavik is a signator on three

4    accounts yet she only claims ownership to one, so that makes

5    me wonder, okay, were these assets properly of a dissolution

6    agreement.  Was there some sort of prenuptial agreement that

7    the parties entered into that predates the filing of this

8    complaint whereby the assets would have been divided in some

9    predetermined way and Mr. Szlavik doesn't have access to

10   them anymore?

11          With regard to the Citizens Bank account, it's

12   essentially a pot of money that people have just been

13   direct-sending money to, and the complaint alleges

14   people direct money to this account, send instructions to

15   Mr. Szlavik, "This is how I want the account -- my money

16   disbursed," and he disburses it, so he's essentially acting

17   as an intermediary.

18          THE COURT:  And has that happened since 2013?

19          MS. STEVENSON:  Frankly, Your Honor, I don't know,

20   and I can't answer that.

21          THE COURT:  So I generally read the complaint --

22          MS. STEVENSON:  Yes, Your Honor.

23          THE COURT:  -- as alleging that the monies in all

24   of these accounts were the proceeds of his involvement in

25   the alleged scheme.

1          MS. STEVENSON:  Yes, Your Honor.

2          THE COURT:  That these were the fees and the

3    commissions that he charged.  They're now sitting there, and

4    he has dominion and control over all of them.

5          Is that not your theory with at least part of the

6    Citizens Bank account, that others still exercise dominion

7    and control over some of those funds?

8          MS. STEVENSON:  I think Paragraphs 28 and 29, Your

9    Honor -- sorry, I haven't mastered the trial binder yet.

10         THE COURT:  No, take your time.

11         MS. STEVENSON:  28 and 29, it actually outlines --

12   and the invoice on 31 is one example where we specifically

13   say, "the centers instruct Szlavik about how to apply the

14   proceeds was also contained in an email between Szlavik and

15   his customers."

16         We have email exchanges later in the complaint

17   where Inge Collins-Bongo is sending emails saying she needs

18   money, money's wired into the account, and then at the

19   instruction is subsequently wire -- or subsequently given to

20   Ms. Collins-Bongo.

21         So certainly he is operating in some capacity, but

22   he's not -- he is -- he's receiving money and doing

23   everything at the behest of the various entities that are

24   listed.

25         And frankly, Your Honor -- and I believe that the

1      claimants attach both sets of interrogatories into their

2      filings -- you'll see they're very tailored.  They're "Have

3      you ever disavowed your ownership interest in this, be it

4      filing a loss on a tax claim or in some civil procedure or

5      some criminal action?"  You know, I'm certainly -- when this

6      is your life, you feel like it's the forefront of

7      everybody's life, but frankly, you know, when the parties

8      entered plea negotiations, that's when, you know -- that's

9      when everything kind of came to a head and the case was.  So

10     our body of information is from 2013, which you'll see there

11     are no acts outside of 2013 alleged in the complaint.

12                 THE COURT:  Okay.  If this indictment issues -- in

13     the Eastern District?

14                 MS. STEVENSON:  Yes, Your Honor.

15                 THE COURT:  And it would be for false statements

16     to a Customs official; is that correct?

17                 MS. STEVENSON:  Yes.  Yes, Your Honor.

18                 THE COURT:  And do the false statements relate to

19     the accounts that are at issue in this case?

20                 MS. STEVENSON:  There are certainly allegations of

21     it, and it's outlined pretty specifically in the complaint.

22                 THE COURT:  So that will obviously raise Fifth

23     Amendment issues --

24                 MS. STEVENSON:  Yes, Your Honor.

25                 THE COURT:  -- in this case.

1          MS. STEVENSON:  And that is why we -- despite the

2     fact of grand jury proceedings being what they are, that's

3     why we did alert the claimants' counsel that this is coming.

4     And to be clear, this is not new news.

5          THE COURT:  Okay.

6          Okay.  Thank you.

7          MS. STEVENSON:  Thank you, Your Honor.

8          THE COURT:  All right, Mr. Smith, address this

9     timing issue, okay, that the government is entitled to test

10    your clients' current claim to see whether the facts that

11    were developed back in 2013, when the complaint was prepared

12    or when the -- that relate to the allegations in 2013,

13    whether those facts are still true today.

14          MR. D. SMITH:  Well, I mean, the government's

15    complaint is not from 2013.

16          THE COURT:  I understand.

17          MR. D. SMITH:  The government's complaint is from

18    this year, and the claim, the verified claim, is from this

19    year.  So I don't really understand the timing issue unless

20    the government's saying, well, between --

21          THE COURT:  Well, the complaint says as of May of

22    this year Mr. Szlavik opened and had control of an account

23    in 2013.

24          MR. D. SMITH:  Right.

25          THE COURT:  And the government's saying, well, for

1    me to know or for us to know whether his current claim is

2    valid or not, whether he has standing to file -- don't

3    laugh, sir.  This is serious, okay?

4              MR. D. SMITH:  Well --

5              THE COURT:  They need to know whether he still has

6    ownership and control of that account.

7              MR. D. SMITH:  You mean three months after he

8    filed the verified claim they want to know if the facts have

9    changed during those three months?  Well, I mean, they could

10   make that argument in any case, right?  That the facts could

11   always have been changed, even if the verified claim was

12   filed a week ago.  So I don't really see that that gets them

13   anyplace.

14             We would notify them.  We have a duty -- first of

15   all, counsel -- that's a verified claim.  If the facts

16   change, the client and counsel have an obligation to tell

17   the Court, "We no longer own this property.  It's not ours

18   any longer.  We sold it, or it's been destroyed or

19   whatever."  We would do that.  We're not aware of any facts

20   having changed between the time the claim was filed and the

21   complaint.

22             In any event, let's assume, for the sake of

23   argument, that two facts had changed.  You know, there was

24   some account where there was some difference.  Again, going

25   back to the *HSBC* case, we would still have overwhelming

1    standing because the facts didn't change with regard to all

2    the other accounts.

3            I mean, again, in *Siriwan*, there was only a claim

4    of control of one of the seven accounts.  Here we clearly

5    own and control and possess every one of those accounts so

6    if even one -- let's assume one fact had changed, and there

7    was some property that was no longer owned by these people

8    where somebody else had acquired an interest in the

9    property, that wouldn't deprive them of standing in any way.

10           Your Honor, I'd like to address a couple of other

11   things that I didn't get a chance to originally.  First of

12   all, Rule 26(b), which deals with protective orders, doesn't

13   contain any exception for the government under Rule G(6).

14   In other words, special interrogatories are not exempted

15   from the general rules that govern discovery, and every --

16   we went through -- in both the motion for protective order

17   and the reply that we filed, which is Document 14 on Page 11

18   onwards, we went through all of the factors under Rule 26(b)

19   which show that this discovery, far from being very

20   tailored, is -- it's just the opposite.  They want to

21   know -- they want to have a detailed explanation of every

22   single dollar that Mr. Szlavik earned that went into his

23   account.  These are incredibly burdensome questions.

24           And, again, you know, the best example of this is

25   Mrs. Szlavik's case.  She's claiming $5,000.  To answer

1    these questions that -- the multiple questions with multiple

2    subparts addressed just to her separately from Mr. Szlavik

3    would cost her far more in attorney fees than the $5,000 at

4    stake.  If that isn't a prima facie case that the government

5    is in violation of the proportionality rules, the undue

6    burden rule, you know, everything that the recent amendments

7    to Rule 26(b) was trying to achieve, the proportionality

8    rule, to cut down on abuse of discovery, you know, this is

9    the case, and Mrs. Szlavik has as much right to challenge --

10   you know, she has standing, too.

11          Not only would it be incredibly expensive, but it

12   will delay the ultimate resolution of this frivolous case

13   for months and months as I know what the government does is

14   any responses we make, they will not be satisfied with.  You

15   know, any objections we make, they will not concede.  So

16   we'll be arguing back and forth over the scope of any

17   permitted discovery under -- that they're allowed to do for

18   months.  And that's the whole point of it, to exhaust us,

19   force us to settle the case when they have no case and at

20   least avoid a defeat.

21          I just can't see it.  Ms. -- the government just

22   made mention of the 2006 amendment which they claim somehow

23   changed things in their favor, but I have to give you the

24   history of this because I was personally involved.  I was

25   the person who caused that amendment to be made when I was

1    working with the advisory committee on civil rules, and that

2    was my suggestion.

3          And the reason is, before the amendment in 2006,

4    the government actually had the right to submit special

5    interrogatories with the complaint right at the same time

6    they filed the complaint on any subject that was permissible

7    under the rules.  In other words, it was not limited to

8    standing.  And the government ruthlessly abused that

9    privilege that they had by filing, you know, dozens of

10   special interrogatories with multiple subparts with the

11   complaint in these civil forfeiture cases, and most people,

12   seeing that mountain of interrogatories they had to answer,

13   just gave up.  They couldn't -- they could barely afford

14   counsel in the first place, even if the government hadn't

15   sent those.  Most people can't afford any counsel.

16         But to see that burden put on counsel and

17   themselves, spending months going through all their

18   financial records for no reason at all, was an incredibly

19   abusive tool for the government.  I knew that, and I

20   convinced the committee that was true, and they needed to

21   amend the rule.  And they agreed to amend it to limit it to

22   standing issues, which, by the way, the government doesn't

23   recognize even though it's right in the advisory committee's

24   notes.  It's in numerous decisions.  But they still refuse.

25   Why?  Because they want to continue to abuse these special

1    interrogatories for the same purpose that they were doing

2    before the 2006 amendment.

3              THE COURT:  Okay.  Are all of the special

4    interrogatories part of your filing?  Does the Court have

5    them?

6              MR. D. SMITH:  Yes.  We attached all of them, Your

7    Honor.

8              THE COURT:  And there's one for each of the nine

9    accounts?

10             MR. D. SMITH:  Yes, I think.

11             MS. STEVENSON:  Your Honor, they're ECF 11.3 and

12   11.4.

13             MR. D. SMITH:  Are there any other questions?

14             THE COURT:  I'm sorry, there are nine separate

15   ones?

16             MS. STEVENSON:  I want to make sure I'm correct.

17   With regard to Mr. Szlavik, there are 25 special

18   interrogatories.

19             MR. D. SMITH:  And with regard to his wife there

20   are ten.

21             THE COURT:  Hold on.

22             MS. STEVENSON:  And with regard to his wife, there

23   are 14.

24             MR. D. SMITH:  Oh, 14, I'm sorry.  I should know

25   that.

1          THE COURT:  Okay.

2          MR. D. SMITH:  But --

3          THE COURT:  Just so I'm clear, there's not a

4    separate set of interrogatories for each account.  There are

5    just two interrogatories, one directed to him and one

6    directed to the wife; is that correct?

7          MS. STEVENSON:  May I respond?

8          MR. D. SMITH:  Yes, Your Honor, and each of those

9    25 and 14 interrogatories has multiple subparts, so if you

10   actually treat the subparts --

11         THE COURT:  I just want to make sure that I have

12   what it is you're moving for a protective order.

13         MR. D. SMITH:  Yes, Your Honor.

14         MS. STEVENSON:  Yes, Your Honor.  There are nine

15   interrogatories that seek basic ownership of each of the

16   nine defendants' accounts, and that's each of the named

17   defendants in the action, and which I noted I believe three

18   are not in Mr. Szlavik's name but in corporate names.

19         THE COURT:  Okay.

20         MS. STEVENSON:  Three interrogatories explain the

21   relationship with the three corporations named in the

22   corporate account.  Two relate to Ms. Szlavik and any

23   property division between them.  But I do believe that

24   within the nine addressing the basic ownership interest, we

25   do ask if he disavowed any sort of ownership through divorce

1    proceedings.

2          Three interrogatories seek information as to

3    whether anyone else has an interest in these accounts, how

4    the claimants' interest was devised and whether the

5    claimants had disclaimed any of the interest in the

6    accounts, and six request info on the largest contributors

7    and the recipients into the Citizens account, which, as

8    alleged in the complaint, were the people depositing founds

9    into this hodgepodge of money and then directing how the

10   funds are going to be directed.  And we have cited in our

11   briefings case law that would support the nature of the

12   interrogatories.

13         And with regard to the 25 and the 14, even within

14   them are redundant as there would be a subpart that said,

15   "Have you ever disavowed ownership to this particular

16   account?"  And then there will be an enumerated question a

17   bit later that says, "If you have ever disavowed, how did

18   you disavow?"  And, again, we're not asking for any

19   documents.  We're not asking for any substance other than

20   responses to answers.

21         And if I may, Your Honor, they're moving for a

22   protective order, and they say that they've outlined all of

23   the requirements, but they essentially make the blanket

24   objections that these are unduly burdensome and, in fact,

25   when we tried to meet and confer about this, simply said,

1    "Well, what if my responses to your interrogatories or I

2    just object to them all because I've made a -- you have made

3    a prima facie showing on my behalf that I have standing."

4    And that's kind of not the purpose of a meet-and-confer and

5    certainly not the purpose of a protective order, to say,

6    "Unilaterally I don't have to answer questions on the basis

7    of it's unduly burdensome," et cetera, et cetera.

8              THE COURT:  Well, we're mixing up two things.

9              MS. STEVENSON:  Yes, Your Honor.

10             THE COURT:  One, there's the legal question

11   whether you have an obligation to answer if there's no

12   colorable argument that they do not have standing; and then

13   second, if you do have some entitlement to an answer, what's

14   the proper scope of the question?

15             MS. STEVENSON:  Certainly, Your Honor.

16             THE COURT:  Okay.  We'll take this under

17   advisement.  We'll get out a written opinion as soon as we

18   can.

19             Okay.  Thanks very much.  Have a good day.

20                   (Whereupon the hearing was

21                    concluded at 11:49 a.m.)

22

23

24

25

1        <u>**CERTIFICATE OF OFFICIAL COURT REPORTER**</u>

2

3                I, LISA A. MOREIRA, RDR, CRR, do hereby

4    certify that the above and foregoing constitutes a true and

5    accurate transcript of my stenographic notes and is a full,

6    true and complete transcript of the proceedings to the best

7    of my ability.

8        Dated this 31st day of October, 2017.

9

10                              <u>/s/Lisa A. Moreira, RDR, CRR</u>
                                Official Court Reporter
11                              United States Courthouse
                                Room 6718
12                              333 Constitution Avenue, NW
                                Washington, DC 20001
13

14

15

16

17

18

19

20

21

22

23

24

25