# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>**Plaintiff,**<br><br>v.<br><br>**$215,587.22 IN U.S. CURRENCY SEIZED FROM BANK ACCOUNT NUMBER 100606401387436 HELD IN THE NAME OF JJ SZLAVIK COMPANIES, INC. AT CITIZENS BANK,** *et al.*,<br><br>**Defendants.** | Case No.17-cv-00853(CRC) |

## MEMORANDUM OPINION AND ORDER

This case turns on what it means to be a "money transmitting business." A federal statute, 18 U.S.C. § 1960, makes it a crime to operate one without a license. And the proceeds of a business operated in violation of that statute are subject to civil forfeiture. The government typically deploys these statutory authorities against non-bank financial institutions like wire remitters and currency exchangers. Rarely, if ever, have they been applied to ostensible nonfinancial professional-services firms that also transfer funds for clients. Until now, apparently.

The government alleges that Pennsylvania-based lobbyist Joseph Szlavik ran an unlicensed money transmitting business by accepting large sums of money from foreign clients—principally the President of Gabon, Ali Bongo, and his associates—and then, for a commission, transferring those funds from accounts he controlled to numerous recipients in the United States as directed by the clients. The underlying funds, the government suggests, are derived from official corruption on the part of President Bongo and his family. On the basis of

these allegations, the government filed a verified complaint seeking forfeiture of $475,405.21 in seized funds that it contends are connected to Szlavik's business.

Mr. Szlavik and his wife have asserted claims to the money and now move to dismiss the government's complaint. The Szlaviks insist that Mr. Szlavik does not operate a money transmitting business but rather a government-affairs and public-relations "consultancy" which is beyond the reach of the money transmitting statute as a matter of law. But this argument rests more on semantics than substance. While Szlavik may offer bona fide professional services to his clients, the complete nature of his business activities remains disputed at this stage. The government's theory is that among the suite of services he has provided is money transmitting. And its complaint, while novel perhaps, contains sufficient allegations concerning the volume, frequency, and circumstances of Szlavik's money transfers to bring his purported activities within the broad ambit of the statute, regardless of what name one assigns them. The Court will therefore deny the Szlaviks' motion to dismiss and permit the case to proceed to discovery, where the factual record can be developed further.

**I.  Background**

The government initiated this forfeiture action on May 9, 2017 by filing a verified complaint *in rem* against $475,405.21 in U.S. currency. Verified Compl. ("Compl.") ¶ 1. The Department of Homeland Security had seized these funds nearly four years earlier, in September 2013, upon a probable cause finding by a Magistrate Judge. Id. ¶ 3. The government seized the funds from nine separate bank accounts "held in the name of Joseph Szlavik" or, in the case of two of the accounts, in the name of businesses which he operated and controlled. Id. ¶¶ 2, *passim.* The complaint alleges that the funds in all nine accounts are proceeds of an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 (b)(1)(A) and (B), and also

property involved in a transaction with the proceeds of a specified unlawful activity in violation of 18 U.S.C. §§ 1956(c)(7)(A), 1956(a)(2)(A), and 1957. Id. ¶¶ 1, 97–108. Forfeiture is sought under 18 U.S.C. § 981(a)(1)(A) and (C). Id.

The government maintains that Mr. Szlavik operated an unlicensed money transmitting business between February 2010 and August 2013. Compl. ¶ 10. During this period, Szlavik allegedly received 19 wire transfers totaling $8.3 million into his accounts. Id. ¶ 27. These funds came mostly from various entities in Gabon, but he also received funds from entities in Switzerland and the United Arab Emirates as well. Id. In the same three-year period, the government recounts that Szlavik distributed more than $8.4 million, including 183 wire transfers of amounts greater than $1,000 to over 30 different individuals or entities and 134 checks for amounts greater than $1,000 to over 40 different vendors, individuals, and financial institutions. Id. ¶¶ 39–40. The complaint describes direct payments from Szlavik's accounts to a number of beneficiaries, including President Bongo's estranged wife. Id. ¶¶ 52–61. It also details payments to various companies and institutions including jewelers, a military academy, and an electrical equipment wholesaler. Id. ¶ 62.

Several of the alleged wire transfers contained references to invoices to be paid with the transferred funds, including fees for Szlavik himself. Id. ¶¶ 28, 32, 39. For instance, the complaint describes an email Szlavik sent in April 2013 requesting $363,340 for payments approved by President Bongo including travel expenses, legal expenses, dental expenses for "cadets" (presumably in the aforementioned military academy) and a $300,000 "consulting fee." A few weeks later, the primary bank account that Szlavik used for these transfers received a $363,340 deposit from an account in the name of the "Republic of Gabon." Id. ¶¶ 24, 29–31.

Finally, the complaint alleges that Szlavik "coordinated and participated in transferring large amounts of bulk cash currency into the United States." Id. ¶ 87. The government contends that Szlavik imported cash from Gabon to pay beneficiaries within the United States while retaining some of the cash as his "fee." Id. ¶¶ 91–92.

After the government filed its complaint, Szlavik and his wife Andrea (who has an interest in at least one of the accounts) filed a verified claim to the seized funds. They have now moved to dismiss the complaint.

## II. Standard of Review

The pleading standard in a civil forfeiture action is governed by both the Federal Rules of Civil Procedure and the Supplemental Rules for Admiralty or Maritime Claims and Asset Forfeiture Actions ("Supplemental Rules"). United States v. One Gulfstream G-V Jet Aircraft, 941 F. Supp. 2d 1, 13 (D.D.C. 2013). Supplemental Rule G(2)(f) requires the government to "state sufficiently detailed facts to support a reasonable belief that [it] will be able to meet its burden of proof at trial." The Supplemental Rules provide a "more exacting" standard "than the liberal notice pleading standard contemplated by Federal Rule 8(a)(2)." Gulfstream, 941 F. Supp. 2d at 14. Just as with a motion under Federal Rule 12(b), the government's factual allegations must be presumed true and liberally construed in its favor. United States v. $79,321, 522 F. Supp. 2d 64, 68 (D.D.C. 2007).

## III. Analysis

The government is seeking to recover the defendant funds under 18 U.S.C. § 981(a)(1)(A) and (C), which make property involved in or derived from violations of certain enumerated statutes subject to forfeiture. The government alleges underlying violations of four such statutes: 18 U.S.C. §§ 1960, 1956(c)(7)(A), 1956(a)(2)(A), and 1957. At bottom, however,

the disposition of the Szlaviks' motion depends mainly on whether the government has adequately alleged that Mr. Szlavik's business meets 18 U.S.C. § 1960's definition of a "money transmitting business." So the Court will start there.

A. 18 U.S.C. § 1960

18 U.S.C § 1960 was enacted by Congress in 1990 "to combat the growing use of money transmitting businesses to transfer large amounts of monetary proceeds of unlawful enterprises." United States v. Velastegui, 199 F.3d 590, 593 (2d Cir. 1999) (citing S. Rep. No. 101-460, at 14 (1990), reprinted in 1990 U.S.C.C.A.N. 6645, 6658–59). It was amended to its current form in the USA PATRIOT Act of 2001. Pub. L. No. 107-56, 115 Stat. 272 (2001). Subsection (a) of the statute imposes criminal liability on anyone who "knowingly conducts, controls, manages, supervises, directs, or owns all or part of an unlicensed money transmitting business." 18 U.S.C. § 1960(a). Subsection (b) then provides that:

> (1) the term "unlicensed money transmitting business" means a money transmitting business which affects interstate or foreign commerce in any manner or degree and—
>
> (A) is operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law, whether or not the defendant knew that the operation was required to be licensed or that the operation was so punishable;
>
> (B) fails to comply with the money transmitting business registration requirements under section 5330 of title 31, United States Code, or regulations prescribed under such section; or
>
> (C) otherwise involves the transportation or transmission of funds that are known to the defendant to have been derived from a criminal offense or are intended to be used to promote or support unlawful activity.
>
> (2) the term "money transmitting" includes transferring funds on behalf of the public by any and all means including but not limited to transfers within this country or to locations abroad by wire, check, draft, facsimile, or courier; and

(3) the term "State" means any State of the United States, the District of Columbia, the Northern Mariana Islands, and any commonwealth, territory, or possession of the United States.

The government alleges that Szlavik operated an "unlicensed money transmitting business" as described under both subsection (b)(1)(A) and (b)(1)(B). (Subsection (b)(1)(C) is not in play). Each of these offenses has its own specific requirements that the Szlaviks argue have not been adequately pled. But, at the threshold, the Szlaviks contend that the government has failed to plead that Mr. Szlavik has engaged in "money transmitting" as defined in § 1960(b)(2), which would mean that his conduct falls outside of subsection (b) altogether.

Specifically, the Szlaviks argue that the government has not alleged that Mr. Szlavik "offered the services of his alleged 'money transmitting business' *to the public*." Reply at 11 (citing § 1960(b)(2)). This argument faces two potential obstacles. First, as noted above, the statute says that "'money transmitting' *includes* transferring funds on or behalf of the public by all means . . . ." 18 U.S.C. § 1960(b)(2). Congress's use of the word "includes" generally indicates that what comes next is "illustrative, not exclusive." Puerto Rico Mar. Shipping Auth. v. ICC, 645 F.2d 1102, 1112 n.26 (D.C. Cir. 1981). If given the customary interpretation here, then transferring funds "on behalf of the public" is not an essential element of a § 1960 offense. The parties have not presented any legislative history on this point and the case law interpreting this language is sparse. But based solely on the statutory language and the structure and purpose of the statute, the Court is inclined to accept the Szlaviks' more restrictive interpretation: that this is one of the rare statutes where "includes" should be read as "means." The language in subsection (b)(2) is so capacious that it is hard to imagine Congress intended it as merely illustrative. That interpretation would leave courts with no meaningful boundary as to what counts as money transmitting; it would potentially sweep in all conduct and make subsection

(b)(2) unnecessary.  See Corley v. United States, 556 U.S. 303, 314 (2009) (applying the "basic interpretive canon" that a "statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal citation omitted)); United States v. Murgio, 209 F. Supp. 3d 698, 706 (S.D.N.Y. 2016) (finding that to "qualify as an 'unlicensed money transmitting business' under § 1960," a business must transfer funds "on behalf of the public."); but see United States v. Emilor, No. 6:07-cr-1, 2008 WL 2152279, at *12 (E.D. Tex. May 21, 2008) (finding that "on behalf of the public" is not an "essential element" of § 1960).

Which brings us to the second obstacle: even if "includes" in subsection (b)(2) is interpreted as "means," the government has nonetheless alleged that Mr. Szlavik operated a business "on behalf of the public."  The Szlaviks argue that this is not so, in part because Mr. Szlavik "cater[ed] solely to a single client"—Gabon.  Mot. Dismiss at 21.  The complaint can be fairly read, however, to allege that Szlavik operated his business on behalf of multiple clients, including entities that wired him funds from Switzerland and the United Arab Emirates, and other entities and people to whom he ultimately provided funds upon request.  See Compl. ¶¶ 27, 52–61.  In any case, the Court does not read the "on behalf of the public" requirement to turn on the number of customers the money transmitter has.  Rather, the most natural reading of the phrase is that the money transmissions must be made for third-parties or customers as part of a commercial or business relationship, instead of with one's own money or for family or personal acquaintances.  And there are sufficient allegations in the complaint that Mr. Szlavik was compensated for the alleged money transfers as part of a business relationship.  See id. ¶¶ 28, 32, 39, 92.  The government has therefore pled facts supporting that Szlavik's activities satisfy the definition of "money transmitting" in 18 U.S.C. § 1960(b)(2).

7

The Court will now turn to the two specific violations of § 1960 alleged by the government.

   1. *Section 1960(b)(1)(B)*

As noted above, § 1960's federal-registration offense, § 1960(b)(1)(B), defines an unlicensed money transmitting business as a "money transmitting business which affects interstate or foreign commerce" and "fails to comply with registration requirements" under 31 U.S.C. § 5330. Section 5330, in turn, requires that money transmitting businesses be registered with the Secretary of Treasury and includes its own definition of a money transmitting business: one that "provides . . . money transmitting or remitting services . . . or any other person who engages as a business in the transmission of funds" and "is required to file reports under 31 U.S.C. § 5313." Id. 5330 § (a)(1), (d)(1)(A), (B). And 31 U.S.C. § 5313 requires that reports be filed by "domestic financial institutions." 31 U.S.C. § 5313. So in order to qualify as a money transmitting business under § 1960(b)(1)(B), the business must also be a "domestic financial institution."

The Szlaviks argue that Mr. Szlavik's business cannot qualify as a "domestic financial institution" because the alleged money transmissions are not "systematic," nor are his services open to the public and a matter of "national concern." Mot. Dismiss at 23–24. But a business need not participate in systematic money transmissions that amount to matters of national concern in order to qualify as a "domestic financial institution." The actual definition of "domestic financial institution" is found in 31 U.S.C. § 5312, and it is broader than the label suggests. That statute defines "financial institution" as "any [] person who engages as a business in the transmission of funds, including . . . as a business in an informal money transfer system." 31 U.S.C. § 5312(a)(2)(R). The relevant Treasury Department regulations echo this broad

understanding of "financial institution"—the term covers "any person doing business, whether or not on a regular basis or as an organized business concern" who accepts currency or funds and transmits the currency or funds "by any means" or engages "in the transfer of funds." 31 C.F.R. §§ 1010.100(t)(3); (ff)(5)(i). Taking all of these statutes and regulations together, courts have broadly construed the definition of both a "money transmitting business" and a "financial institution." See, e.g., Velastegui, 199 F.3d at 592, 595 n.4 (defining a "money transmitting business" under § 1960 as transmission of money for a fee involving more than "a single, isolated transmission of money"); United States v. Banki, 685 F.3d 99, 113 (2d Cir. 2012) (noting that "section 1960 defines 'money transmitting' broadly" and holding that the district court should have included Velastegui's definition in § 1960 jury instructions); United States v. Tannenbaum, 934 F.2d 8, 12 (2d Cir. 1991) (finding that an individual can qualify as a financial institution).

The question, then, is whether the allegations in the complaint support a reasonable belief that the government will be able to prove that Mr. Szlavik operated an unlicensed money transmitting business under the above definitions, notwithstanding what other professional services he may have also provided to his clients. See United States v. Elfgeeh, 515 F.3d 100 (2d Cir. 2008) (affirming § 1960 conviction of defendant who ran a *hawala*, an informal money transmitting business, out of his ice cream shop). The Court finds that they do.[1] Allegations that

---

[1] The Szlaviks argue that the government has not sufficiently pled the *mens rea* required for a violation of § 1960. Reply at 19. The Court need not consider this argument, as it was first raised in their reply brief. McBride v. Merrell Dow & Pharm., Inc., 800 F.2d 1208, 1210 (D.C. Cir. 1986) ("We generally will not entertain arguments omitted from an appellant's opening brief and raised initially in his reply brief."). In any case, the government's complaint pled the proper *mens rea* standard when it stated that Szlavik "knowingly conducted, controlled managed, supervised, directed and owned an 'unlicensed money transmission business.'" Compl. ¶ 10; Elfgeeh, 515 F.3d at 132–33 (holding that § 1960 requires "that the defendant knew that the

Szlavik distributed more than $8.4 million on behalf of clients through hundreds of wire transfers and checks to many different individuals, vendors, and financial institutions while charging a fee for his services, Compl. ¶¶ 27, 28, 32, 39, 40, meet the expansive definition of "money transmitting business" in § 1960 and its ancillary definitions in §§ 5330 and 5313 (for instance, a person who "engages as a business in the transmission of funds"). They also fall within the broad definition of "financial institution" in § 5312 and its implementing Treasury regulations (for instance, a person who engages in the transmission of funds "as a business in an informal money transfer system").

      The Szlaviks argue that Mr. Szlavik's business falls outside even these broad definitions of a "money transmitting business" and "financial institution" because any funds transfers that he executed were merely courtesies "incidental" to his nonfinancial consulting services. Mot. Dismiss at 21. Speaking to this point, the Treasury regulations provide that whether a person engages in money transmitting is "a matter of facts and circumstances" and someone who "[a]ccepts and transmits funds only integral to the sale of goods or the provision of services, other than money transmission services" is not a money transmitter. 31 C.F.R. § 1010.100 (ff)(5)(ii). The facts and circumstances here may ultimately establish that the money transfers catalogued in the complaint fit within this safe harbor. But for now the government's allegations support an inference that Szlavik was paid specifically for transmitting funds rather than for other services—for instance, when he retained a "fee" from the bulk cash he allegedly imported from Gabon and distributed to people in the United States—and therefore that his funds transfers

---

business was engaged in money-transmitting and also knew that the business had no money-transfer license," but not that the defendant knew the license was required).

were not all "integral" to other bona fide transactions. Compl. ¶¶ 91–92. That is enough to sustain the government's complaint at this stage.

In a similar vein, the Szlaviks suggest that applying § 1960 to businesses that transfer funds as part of work they do for clients would subject other professional services firms, including law firms, to misguided prosecutions and civil forfeiture actions. Mot. Dismiss at 21. This concern may well be valid. But the Court's job at this juncture is to decide whether the government has statutory authority to seek forfeiture based on the conduct alleged in its complaint. It is not to predict how the government might choose to exercise its authority in future cases. In any event, the government has described a number of transfers—such as those to President Bongo's ex-wife, a jewelry store, and a dentist—that strike the Court as falling well beyond the heartland of customary government-affairs or legal services that the Szlaviks warn are threatened by the forfeiture sought in this case. See Compl. ¶¶ 52–62.

Finally, the Szlaviks argue that because some of the funds were transferred into the accounts *after* they had been seized, the government has failed to allege how those funds could be "traceable" to a money transmitting business. Mot. Dismiss at 29. But at this stage the government must only demonstrate a *reasonable belief* that it will be able to prove that Mr. Szlavik operated an illegal money transmitting business—it need not account for every dollar that passed through the accounts. See United States v. 5443 Suffield Terrace, 209 F. Supp. 2d 919, 923 (N.D. Ill. 2002) (civil forfeiture complaint need not cite specific illegal transactions where it "describ[es] a pattern of behavior that suggests" illegality); 18 U.S.C. § 983(a)(3)(D) (providing that no civil forfeiture complaint may be dismissed "on the ground that the government did not have adequate evidence at the time the complaint was filed to establish the forfeitability of the property"). In any event, the sheer volume of money transfers detailed in the

complaint supports an inference that funds received into the accounts soon after their seizure were part of the alleged money transmitting business. The Court will therefore decline to dismiss this count of the complaint.

2. *Section 1960(b)(1)(A)*

The government also alleges a violation of 18 U.S.C. § 1960(b)(1)(A), the state-law counterpart to subsection (b)(1)(B). Under subsection (b)(1)(A), a "money transmitting business" must "affect interstate commerce" and be "operated without an appropriate money transmitting license in a State where such operation is punishable as a misdemeanor or a felony under State law." The government alleges that Szlavik failed to obtain the required license in the District of Columbia and Pennsylvania.[2]

The District of Columbia Money Transmitters Act states that "no person shall engage in the business of money transmission without obtaining a license issued by the Superintendent." D.C. Code § 26-1002. The Szlaviks argue that this statute is inapposite because it was not intended to apply to nonfinancial consulting businesses. Mot. Dismiss at 26. But this argument suffers from the same flaw as the Szlaviks' argument under § 1960(b)(1)(B): the nature of Mr. Szlavik's business activities is a matter of disputed fact that the Court cannot resolve at the motion to dismiss stage. Again, the question is whether the allegations in the complaint support

---

[2] The Szlaviks argue that the government does not allege a violation of the Pennsylvania money transmitting statute because it does not mention the statute in the "charging section" of the complaint. Reply at 18. The section of the complaint to which the Szlaviks refer is the first paragraph of the "Statement of Facts," which includes a reference to Mr. Szlavik's failure to obtain a license in D.C., but does not mention Pennsylvania. Compl. ¶ 10. But the complaint says elsewhere that neither Szlavik nor his businesses "were licensed to conduct business as a money transmitter in either the District of Columbia or Pennsylvania." Id. ¶ 17. And all of the factual allegations in the complaint are incorporated by reference in the four "Claims for Relief," including the alleged violation of 18 U.S.C. § 1960. See id. ¶¶ 106–07. This is sufficient to state a claim that Szlavik violated Pennsylvania's money transmitting licensing statute.

a reasonable belief that the government can prove by a preponderance of the evidence that Szlavik violated the D.C. statute and, consequently, § 1960(b)(1)(A). The government argues that it has met this burden by alleging that Szlavik maintained offices in the District of Columbia for two of his businesses, Scribe Strategies & Consulting and Scribe Strategies & Advisors. See Compl. ¶¶ 16, 62.

The Szlaviks counter that D.C. Code § 26-1002 did not obligate Mr. Szlavik to acquire a license because he did not undertake any business in Washington, D.C. and resided exclusively in Pennsylvania, where all of his companies are registered. Mot. Dismiss at 28. But that, too, is a factual issue that cannot be resolved through a motion to dismiss. In any case, even if Szlavik did not engage in money transmitting in the District, the government has still adequately pled a violation of § 1960(b)(1)(A) because the complaint also alleges that Szlavik violated Pennsylvania's unlicensed money transmitting statute. See Compl. ¶ 17. That statute makes it a felony to "engage in the business of transmitting money by means of a transmittal instrument for a fee or other consideration with or on behalf of an individual without first having obtained a license from the department." 7 Penn. Cons. Stat. §§ 6102(a), 6116. The government has sufficiently pled a violation of this statute by alleging that Szlavik transmitted millions of dollars from Pennsylvania-based companies while collecting fees for himself without a Pennsylvania money transmitting license. Compl. ¶¶ 28, 32, 39, 40.

B. 18 U.S.C. §§ 1957, 1956(c)(7)(A), and 1956(a)(2)(A)

In addition to violations of § 1960, the government alleges violations of three other statutory provisions: 18 U.S.C. §§ 1957, 1956(c)(7)(A), and 1956(a)(2)(A). As the Szlaviks correctly observe, these allegations rise and fall with the § 1960 claims because each depends on whether the defendant funds are derived from "specified unlawful activity"—in this case an

13

unlicensed money transmitting business.³ See Mot. Dismiss at 33–34. Because the Court has already found that the government has sufficiently pled a violation of § 1960, and because the government also alleges international transactions greater than $10,000, see Compl. ¶¶ 12, 32, 34, 35, 39, it has sufficiently pled a violation of these provisions.

C. Statute of Limitations

Besides challenging the application of § 1960 to Mr. Szlavik's business, the Szlaviks contend that all of the government's claims are barred by the statute of limitations. The federal statute of limitations for forfeiture suits is five years beginning when the government "discovered" the alleged offense. 19 U.S.C. § 1621. The conduct alleged in the complaint began in February 2010 and the complaint was filed in May 2017. The Szlaviks argue that the government was on "inquiry notice" of its claims as of February 2010, when the United States Senate Permanent Subcommittee on Investigations issued a report that detailed how President Bongo and his family used financial institutions to launder proceeds of corruption. According to the Szlaviks, the existence of this report put the government on notice of its claims in this case. Mot. Dismiss at 30–33.

But this Circuit has made clear that "because statute of limitations issues often depend on contested questions of fact, dismissal is appropriate only if the complaint on its face is conclusively time-barred." Firestone v. Firestone, 76 F.3d 1205, 1209 (D.C. Cir. 1996). Here the complaint is not conclusively time barred—it gives no indication of when the government

---

³ Section 1957 states that "specified unlawful activity" is defined by § 1956. 18 U.S.C. § 1957(f)(3). Section 1956(c)(7)(A) defines "specified unlawful activity" as an "act or activity constituting an offense listed in section 1961(1)," which in turn includes § 1960. Additionally, for a violation of § 1957, the monetary transaction must be "of a value greater than $10,000." And for a violation of § 1956(a)(2)(A), the monetary transaction must be between the United States and "a place outside the United States."

learned of Szlavik's alleged money transfers. In any case, the report cited by the Szlaviks concerns President Bongo's use of U.S. accounts to launder money. See Mot. Dismiss Ex. B. It does not mention anything about Mr. Szlavik and his business, and therefore does not even suggest, let alone prove conclusively, that the government discovered the claims outside of the limitations period.

## IV. Conclusion

The government has alleged facts that support a reasonable belief that it will be able to prove by a preponderance of the evidence that Szlavik operated an unlicensed money transmitting business in violation of 18 U.S.C. § 1960 and in violation of 18 U.S.C. §§ 1956(c)(7)(A), 1956(a)(2)(A), and 1957. It is therefore

**ORDERED** that [5] Claimants' Motion to Dismiss is DENIED.

**SO ORDERED**.

CHRISTOPHER R. COOPER
United States District Judge

Date: March 30, 2018